1. WILLS—CONSTRUCTION—TRUSTS.
    Testator devised his estate to a trustee, to be applied "(1) to the support, care, and comfort of my wife, A., so long as she may live; and, (2) so far as necessary and possible, to the support of my sister, M., so long as she may live," and directed that on the death of either the entire estate should be applied to the support of the other. *Held*, that the will created a single trust for the benefit of the wife and sister, and not successive trusts.

2. INSANE PERSONS—DUTY OF COMMITTEE.
    It is the duty of the committee of a lunatic to furnish all proper recreation and amusements consistent with her former habit of living, as well as necessaries, without reference to the interests of the next of kin and heirs at law; and he may provide for the payment of the lunatic's customary church contributions, and make a proper allowance to her to be expended for gifts or in charity.

Final accounting of Alonzo Reed as committee of the person and estate of Anna L. Knapp, a lunatic.

Howard Chipp, Jr., for the committee, petitioner.
John D. Eckert, for Helen McClain, administratrix of the lunatic, contestant.

CLEARWATER, J.    Edward W. Knapp died at Kingston on the 23d of April, 1889, having executed a will on the 7th of January of that year, which was admitted to probate on the 7th of May following. He left no descendants, and by his will bequeathed and devised his entire estate to George W. Johnston, John B. Alliger, and Joseph C. Knapp, in trust, "to be nursed, managed, and invested in the best manner possible, and applied and distributed" first in the payment of certain specific legacies, then "to use the balance of by estate, and the income therefrom, (1) to the support, care, and comfort of my wife, Anna L. Knapp, so long as she may live; and, (2) so far as necessary and possible, to the support of my sister, Maria Stringham, so long as she may live.    Upon the death of either my said wife or sister, I direct my said trustees to apply said balance and income to the support and maintenance of the survivor so long as she may live.    After the death of both my wife and sister, if any of the estate be left," he bequeathed the same to various residuary legatees, among whom is the wife of the petitioner.    The value of his estate was about $25,000. His household for many years had consisted of his wife, whose intellect had been impaired by a softening of the brain, his widowed sister, Maria Stringham, to whom, in addition to the provision above specified, he bequeathed $1,000, "the same being a slight token of her affectionate care of my wife and myself in sickness and in health." Long prior to his death there had been purchased the house in which he lived, the title being taken in the name of his wife; and on the 25th day of October, 1870, with her, he executed a mortgage covering this

property to the Poughkeepsie Savings Bank to secure the payment of $3,000, he alone executing the bond accompanying the mortgage. On the 8th day of January, 1878, he took from the bank an assignment of this bond and mortgage, there being at that time due for principal and interest $3,053. He held them at the time of his death, and they were treated by his executors as a part of his personal estate, having apparently been kept open for the purpose of perfecting title by foreclosure in event his wife's condition should remain such as to preclude her from executing a valid conveyance of the property, should at any time it become desirable to sell. There was an insurance of $2,000 upon his life, payable at his death to his wife, the amount of which was paid to her, and which, with some furniture and the house, formed substantially her entire estate. Her condition becoming gradually worse, application was made to this court on the 23d day of July, 1889, for the appointment of a committee of her person and estate, and the petitioner was appointed such committee on the 1st day of October of that year. The trustees, who were also executors, finding Mrs. Knapp's recovery to be highly improbable, foreclosed the mortgage in December, 1889, and, on the sale, took title to themselves as trustees. The amount then alleged to be due was $5,506, exclusive of costs. After the appointment of the petitioner, and before the sale of the property, he paid from the estate of Mrs. Knapp, derived from the insurance moneys, various sums for the reparation and improvement of the property, and the taxes upon it. The repairs were necessary, and the expenditures for them not unreasonable. Mrs. Knapp died on the 22d day of June, 1890, leaving as her nearest surviving relative her sister, the contestant, a resident of the state of Kentucky, who has been appointed her administratrix, and some nephews and nieces residing in the states of Tennessee and Arkansas. The committee filed his account, charging himself with the moneys received, with a slight increase by way of interest, and crediting himself with moneys expended, showing a practical disbursement of the entire fund. The expenditures, aside from repairs and taxes, were for medical attendance, nurses, the support and maintenance of the lunatic during her life, and the legal expenses of the adjudication in lunacy. There are items of cash given to the lunatic, to be expended by her at her pleasure; moneys paid for Christmas presents selected by her, and given, at her direction, to various friends; moneys paid out at her request to the church which she attended; moneys for rugs and other furniture, for shawls, millinery, carriage hire, flowers, magazines, and newspapers. It is now claimed by her administratrix, the contestant, that the moneys thus expended were improperly paid out by the committee; that the estate of the husband was primarily liable for all expenditures made by him; that his accounts should be disallowed; that he should be required personally to refund the moneys which he has expended, and to personally defray the expenses of this proceeding. All of the moneys disbursed were paid without application to the court, and without its advice or order; and it is contended that the committee has been derelict in duty, and that he has conserved the estate of the husband, to the sacrifice of the estate of

the lunatic.    There was found among the papers left by Mr. Knapp at the time of his death an undated, unsigned letter, in his handwriting, presumably intended for his wife, which is as follows:

"I find, by anxious thought and examination, that your health will not permit you to take charge of the little property that I shall leave for the joint support of yourself and Maria.  I have concluded to change the original will, and put it in charge of three trustees, who I firmly believe are good, kind, and honest men; that is, I have put in all I have a legal right to put in. The title of the house and lot is in your name.  Consequently I cannot do anything with that, and it must be left for you to do, viz. assign the deed to the trustees, and let it go in with the part already given them.  I think this much the best plan, for it will take less expense to handle than in a separate state.  Besides, there is where it belongs.  I am in hopes that, take it all together, and well managed, also very economically used, there will be enough to give you and Maria a fair, if not a comfortable, support, which is all I can hope for.  It may be an advantage to sell the house and lot, and buy a less expensive one, where you may be just as comfortable, and perhaps more so.  So I hope you will put the house and lot in which you hold the title.  Also you will have $2,000 in cash from life insurance.  This latter sum, have the trustees do with as they may think wisest and best.  I have done already all I can do myself legally, and now I leave it for you to finish out as it should be.  I am very anxious that everything shall be made to go as far as possible, so that you and Maria may be as comfortable as possible all your remaining days."

This letter is, of course, without testamentary effect, the language of the will being unambiguous and distinct.    I am inclined to regard the will as creating a single and not successive trusts.    While it is true the testator directed that after the payment of specific legacies the balance of his estate and income should be devoted (1) to the support, care, and comfort of his wife so long as she might live, (2) so far as necessary and possible to the support of his sister so long as she might live, he directed that, upon the death of either his wife or sister, his trustees should apply the balance of the estate and the subsequent income to the support and maintenance of the survivor as long as she might live.    This is not, in legal effect, a direction that the estate and income should first be devoted to the maintenance of the wife, and after her death to the maintenance of the sister, but rather that the wife should first be provided for, and that, if the estate and income were more than sufficient for her support, the residue should be applied to the maintenance of the sister, pari passu.    At the time of the execution of the will, Mrs. Stringham, the sister, was dependent upon the testator for support.    His wife, although much younger in years, was, by reason of the diseased condition of her brain, less able to care for herself; and the testator's scheme of distribution, as is apparent, was to make ample provision for the maintenance of his wife, and such provision for the maintenance of his sister as the amount of his estate, and the income derived from it, would permit.    Thus, the beneficiaries were to be jointly supported from the estate, so far as that was possible; and it is manifest that it was his desire that the principal estate should be trenched upon as little as possible, in view of the fact that his wife's mind was permanently affected, although her bodily health was good, and in the order of nature she might be expected

to survive his sister by many years. It was the duty, therefore, of the trustees to follow his instructions, and "nurse, handle, and invest his estate in the best manner possible." As Mrs. Knapp's estate consisted of the house and lot, of which she had the legal title, although equitably it was the property of her husband, and of the insurance moneys received upon a policy upon which he had paid the premiums, her committee was entirely justified in consulting the letter left by Mr. Knapp, in connection with the provisions of his will, for the purpose of ascertaining his view as to the manner in which the joint estates could best be conducted to carry out his wishes for his wife's maintenance and happiness.

I am unable to agree with the contention of the counsel for Mrs. Knapp's administratrix that the committee owed any duty to the contingent interests of the representatives of either her real or personal estate. Upon the contrary, it is the paramount duty of the committee of a lunatic to attend to her personal wants and comforts, and to furnish her, so far as the funds in his hands will allow, with not only all the necessaries of life, but all the proper recreation and amusements consistent with her former habit of living. It is his duty, likewise, to avail himself of medical advice, and all other reasonable means that may tend to the restoration of his ward or the amelioration of her condition. The care, health, and comfort of the lunatic alone are to be considered; and this without reference to the interests of the next of kin, heirs at law, and expectants. Viets v. Bank, 101 N. Y. 563, 5 N. E. 457; May v. May, 109 Mass. 258; Hambleton's Appeal, 102 Pa. St. 50; Lord Loughborough in Oxenden v. Compton, 2 Ves. Jr. 69; Ex parte Baker, 6 Ves. 8; Dormer's Case, 2 P. Wms. 262; Ex parte Whitbread, 2 Mer. 99; Frost's Case, 5 Ch. App. 699; Haycock's Case, 5 Russ. 154; Carysfort's Case, 1 Craig & P. 76; 2 Van Sant, Eq. Prac. 378. The maintenance of a lunatic is by no means limited to the amount of her income, but her whole estate may be expended in her support, should that become necessary. A committee may arrange for the maintenance of the domestic establishment of a lunatic to the same extent as before the beginning of lunacy. He may also provide for the payment of the lunatic's customary contributions to the church which she had been in the habit of attending, and to the making of a proper allowance to the lunatic, to be expended by herself, for gifts to friends, dependents, servants, or in charity. In re Strickland, 6 Ch. App. 226; In re Heeney, 2 Barb. Ch. 326; In re Gilbert, 3 Abb. N. C. 222. And, as the evidence here shows the social position of Mr. and Mrs. Knapp to be as good as that of any one in the community in which they lived, it was entirely proper for this committee to maintain Mrs. Knapp in the same social state as before her husband's death. It was evidently Mr. Knapp's intention that the house and lot should eventually become, as it did become, under the sale in foreclosure, a part of his own estate; and it was proper for the committee to maintain Mrs. Knapp in her own home, rather than to remove her to one to which she was unaccustomed, the mere removal to which might, and probably would, have pro-

duced a depressing effect upon an already enfeebled mind. The duties of the committee of a lunatic, and those of an executor or administrator, differ so widely that the rules governing the conduct of the one have but scant application to the duty of the other. As before stated, the duty of a committee is to the lunatic alone, whose well-being and comfort are of primary consideration. Executors and administrators, upon the other hand, are trustees for the benefit of creditors, legatees, and next of kin; and it is their duty to conserve with great economy all the estate coming into their hands, for the benefit of their cestuis que trustent.

So far as is disclosed by the evidence on this proceeding, Mrs. McClain, the contestant, residing in the state of Kentucky, paid little if any attention to Mrs. Knapp during the lifetime of the latter. Nor did she, to the slightest extent, contribute to the acquisition of any portion of the estate belonging to her sister, and disbursed by her committee. Causes are not infrequently brought to the attention of courts of justice in which a relative, who gave little attention to the living invalid when the latter was most in need of affectionate tenderness and care, proves the reverse of indifferent in efforts to obtain possession of an estate, with the creation and accumulation of which he or she had absolutely nothing to do. This is an attitude which does not especially appeal to courts of equity, nor is it apt to unduly influence them to be astute in the effort to discover evidence of misconduct in acts which are equally consistent with innocence; and, unless such a position be fortified by the violation of well-settled legal principles by an officer of the court, it does not necessitate the hypercritical scanning of his account by the judge to whom it is presented for settlement and allowance. "Semper in dubiis benigniora præferenda sunt," is the benign maxim of the civil law, tempering the severity of the common law. A careful examination of Mr. Reed's accounts fails to convince me that he has been derelict in duty, or extravagant in expenditure; and, while it would have been wiser for him to have applied to the court for instructions, still, as he does not appear to have acted in bad faith, and as his position was a delicate one, calling not only for the exercise of good judgment, but of kindly feeling, I am disposed to view with lenience his having treated his ward indulgently, rather than in the more rigid and possibly more frugal manner now urged by the contestant.

A decree may be taken passing his accounts providing for the distribution of such moneys, if any, as remain in his hands, and discharging him from further liability in the matter.