WILLIAM BINNEY *vs.* RHODE ISLAND HOSPITAL TRUST CO.
Trustee, *et al.*

JULY 9, 1920.

PRESENT: Sweetland, C. J., Vincent, Stearns, Rathbun, and Sweeney, JJ.

*(1)   Appeal and Error.   Finding of Superior Court Conclusive.*
Where no appeal is taken from a finding of the Superior Court its ruling on that point is conclusive, in appellate proceedings in the cause.

*(2)   Probate Law.   Estates of Incompetents.   Superior Court.   Equity.*
The Superior Court has no inherent power and the statutes defining its powers do not invest it with authority to direct the carrying out by the estate of an incompetent of an arrangement not of a contractual nature, made while the incompetent was *compos mentis*, with one not a relative for the care and management of certain real estate, and the continuance of an allowance by the estate of incompetent to meet the expenses, on the ground that such arrangement was agreeable to the incompetent and to some extent beneficial to her estate and there being no financial reason for making any change she would have continued the same during her life had she remained *compos mentis*.

*(3)   Equity.   Probate Law.   Estates of Incompetents.*
On a bill in equity seeking to compel the carrying out of an arrangement made by an incompetent while *compos mentis* with the complainant, by the estate of incompetent, involving the care and management of real estate and the payment of an allowance for the expenses of complainant, the rights of respondent to have ascertained and provision made for payment by complainant of a fair rental for the property for the period between the date of the notice by conservator to complainant that his occupancy of the estate would be terminated and the death of the incompetent cannot be considered but the conservator must seek her rights in another proceeding.

*(4)   Estates of Incompetents.   Probate Courts.*
In this State, long before the adoption of the constitution, the General Assembly had placed persons unable to care for themselves together with their estates in the care of courts of probate.

SWEETLAND, C. J., and RATHBUN, J., concurring.

VINCENT, J.   This is a bill in equity brought by William Binney against the trustees under the wills of Charlotte R. Goddard and Moses B. I. Goddard and also against Elizabeth A. Goddard, widow of Moses B. I. Goddard, and Caroline K. Everett as conservator and executrix. The

bill was filed May 20, 1918. Charlotte R. Goddard, the grandmother of the complainant deceased on June 15, 1881, leaving a last will and testament by which she created a trust of the residue for her son, Moses B. I. Goddard, for life, and upon his decease to pay over the income arising therefrom to the widow of her said son Moses for life, and upon further trust, subject to the life estate, for the persons who should be her heirs at law at the decease of Moses.

Moses B. I. Goddard died on May 14, 1907, leaving a will by which he devised and bequeathed the residue of his estate to his wife, Elizabeth A. Goddard, and to his brothers, William Goddard and Robert H. I. Goddard, in trust, to pay to his wife, Elizabeth A. Goddard, fifteen thousand dollars a year, and also the balance of his income after other bequests, for life, with gifts over upon her decease. Elizabeth A. Goddard survived Moses B. I. Goddard. Elizabeth A. Goddard having become mentally incapacitated, the probate court of Warwick, on March 22, 1917, appointed the respondent Mrs. Caroline K. Everett as conservator of her estate. Elizabeth A. Goddard deceased on October 18, 1918, after the commencement of this suit, and Mrs. Everett the executrix of her will, was joined as a party respondent.

Mr. Binney, the complainant, is one of the heirs at law and next of kin of both Charlotte R. Goddard and Moses B. I. Goddard.

A part of the residuary estate held by the trustees under the will of Charlotte R. Goddard consisted of a large estate at Potowomut including the mansion house, numerous other buildings and a farm which, together with another nearby tract, part of the estate of Moses B. I. Goddard has been commonly designated by the name of "Hopelands." Part of the residuary estate under the Moses B. I. Goddard trust also consisted of a house and lot in Providence on the corner of Brown and Benevolent streets, described in the bill as the "Brown Street Estate."

These two portions of the trust estate are the only portions with which we are concerned in the present proceeding.

Elizabeth A. Goddard with her husband, Moses B. I. Goddard, for a long time used these estates as places of residence, occupying one in summer and the other in winter. After the death of Mr. Goddard, Mrs. Goddard, for reasons which are not material here, found that her continued occupancy of these estates would be inconvenient and undesirable. Wishing however to maintain and keep them up in accordance with her obligation as a life tenant, as well as for family and sentimental reasons, she was led to consider the advisability of finding some one, preferably a relative of her husband, to whom she could intrust their care and management under some arrangement that would be mutually satisfactory. Her choice fell upon Mr. Binney, the complainant, a nephew of her husband, Moses B. I. Goddard, and a descendant of Charlotte R. Goddard.

Previous to January, 1908, the complainant with his family began to occupy the two estates. The arrangement entered into between him and Elizabeth A. Goddard was that the complainant should assume the care and management of these estates including the carrying on of the farm and that he should be exempted from the payment of any rent. Mrs. Goddard on her part was to contribute the sum of $6,000 per year to meet the attendant expenses, which sum was to be made up by quarterly deposits of $1,500 each in a special bank account, with a power of attorney to the complainant to draw therefrom, the taxes, repairs and insurance to be paid by the trustees under the will of Charlotte R. Goddard in addition to the allowance. The complainant continued to occupy these estates under the arrangement as above set forth until July 1, 1911, when the amount to be deposited for the expenses of the estate was reduced from $6,000 to $4,000, but the arrangement was not otherwise changed. In the summer of 1912 the mental powers of Mrs. Goddard began to fail. In January, 1913, Mrs. Everett took charge of her business affairs, under a power of attorney, upon the advice and with the consent of R. H. I. Goddard, one of the trustees. Mrs. Everett was the residuary legatee

under the will of Mrs. Goddard and this fact was known to said trustee who permitted the quarterly deposits to the special account of the complainant to be continued.

After the death of R. H. I. Goddard, trustee as aforesaid, the succeeding trustee, the Rhode Island Hospital Trust Company, refused to honor either power of attorney and make further payments of income, except for the personal use of Mrs. Goddard, without the appointment of a conservator, and Mrs. Everett was accordingly appointed on March 22, 1917. No further deposits were made to the special account of the complainant although he remained in occupation of the estates.

On December 31, 1917, the conservator, Mrs. Everett, notified the complainant that his occupancy of the two estates should terminate unless he desired to rent them and that the allowance to him should not be resumed. The complainant objected to making any such business arrangement claiming that his relation with Mrs. Goddard was contractual and that he was entitled to receive the allowance of $1,000 per quarter during her life.

The case was tried in the Superior Court and it was there held (1) that the arrangement between the complainant and Elizabeth A. Goddard was not contractual and (2) that said arrangement was agreeable to Elizabeth A. Goddard and to some extent beneficial to her estate and, there being no financial reason for making any change in said arrangement, she would have continued the same during her life had she remained *compos mentis,* and a decree was accordingly entered ordering the respondent Caroline K. Everett to pay to the complainant the sum of $9,000, being the sum of nine quarterly installments with interest until the time of payment computed at six per cent per annum on each quarterly installment of $1,000 due on and after October 1, 1916, to and including October 1, 1918.

From this decree the respondent Caroline K. Everett, as conservator and executor, has taken an appeal to this court.

We think that the conclusion of the trial court that there was no contractual relation between the complainant and Elizabeth A. Goddard was correct. The complainant contends that a contract is evidenced by certain letters, written to him by Mrs. Goddard, and that such letters in connection with other facts showing a partial or full performance on the part of both Mrs. Goddard and himself establishes a contract. We think that the complainant has overestimated the probative force of the correspondence referred to as well as the importance of other facts upon which he relies as showing a partial or full performance.

From an examination of the letters of Mrs. Goddard and considering the various acts of the parties upon which the claim of performance is based we are unable to find sufficient evidence to justify the conclusion that the relations between the complainant and Mrs. Goddard were contractual, to continue during the life of the latter, but that on the contrary we are led to the conclusion that it was the intent of Mrs. Goddard that the arrangement was to continue so long as it might prove mutually agreeable.

It is noticeable that in none of the letters of Mrs. Goddard to the complainant is there any mention of a contract nor does she make use of any language from which it might be inferred that she had a contract in mind. On July 15, 1909, being under the impression that certain litigation against the estate of her husband, Moses B. I. Goddard, was likely to result in a serious diminution of her income, she advises the complainant that she would be obliged to close Hopelands and was thinking of putting a man and wife there just to look out for the house. On November 28, 1909, she writes the complainant that she must reduce the expenses at Hopelands very materially and that she had calculated that for $2,000 a year she could get a man and wife who would live in the farm part, look after the house and keep the grass cut around it abandoning *all* farming, giving to the complainant however the privilege of living there with a quarterly allowance of $500. On October 9, 1910, she again

writes the complainant reducing the allowance from $6,000 to $4,000 payable quarterly.

In all of these letters Mrs. Goddard seems to deal with the matter of Hopelands with a freedom which would be inconsistent with a contract, the existence of which the complainant now claims. And it may be said further that the decision of Mrs. Goddard at one time to close Hopelands to the complainant, at another time to suggest a reduction of the allowance to $2,000, and still later to actually fix the allowance at $4,000 did not, so far as appears, provoke the complainant to assert the existence of a contract, nor lead him to question her independent action in the control and management of the estate.

We have thus far discussed the matter of contract upon its merits. The respondent however argues that inasmuch as the Superior Court has found that no contractual relations existed between the complainant and Mrs. Goddard, and no appeal having been taken from such finding by the complainant, the ruling of the Superior Court on that point is conclusive and we think that the authorities support that contention. *Vaill* v. *McPhail*, 34 R. I. 361.

The complainant anticipating a possible finding by this court that no contractual relations existed between him and Elizabeth A. Goddard sets up the claim that he is entitled to have the decree of the Superior Court affirmed upon another ground which is separate and distinct from the matter of contract and in support of such claim he invokes and seeks to have established by this court the legal principle "that the making of a regular allowance or conferring of other benefit by a lunatic or person of unsound mind to or upon another, whether or not related to him by blood or marriage, will be continued as against the guardian or conservator, if the court is convinced that such course would have been continued by the incompetent if sane; since the court will act with reference to the lunatic's affairs as it is probable he would have acted if of sound mind."

The Superior Court adopted this view as set forth by the complainant and thereon based its decree in his favor, expressing itself in its rescript upon the motion for preliminary injunction and also upon the merits as follows: "We are satisfied that in all probability said arrangement would be continued by said Elizabeth A. Goddard. All the circumstances in evidence indicate clearly that she did not desire to have said estates occupied by any but members of the family; that she had no desire to profit by leasing it; that considerations of family pride in the estates which had been long in the family and regard for her late husband induced said Elizabeth A. Goddard to make said arrangement, and it was particularly agreeable to her to have said complainant occupy and care for said estates. The evidence indicates that she would like to have been able to devise said estates to the complainant and thought that some family arrangement should be made whereby he could enter and occupy them." . . .

"There came a time during said occupancy when said Elizabeth A. Goddard felt that because of a serious law suit in which her husband's estate was involved, she was liable to lose all income from said estate and therefore could not continue to carry out said arrangement with complainant. It may be, as testified by the conservator, that at that time she indulged in expressions of regret to continue the arrangement with the complainant, but even at that time she merely wrote him that she would have to put a farmer and his wife into Hopelands at a cost to herself of $2,000 a year. She never in any of her letters indicated any desire that the complainant should leave the Brown Street estate. Upon being reassured as to her fears of not getting further income from her husband's estate, her purpose of terminating her arrangement with complainant as to Hopelands changed. She wrote that she thought that her estimate of $2,000 was too low and indicated her entire willingness that the complainant should continue to occupy Hopelands with an allowance of $4,000 a year. Her letters subsequently

indicate satisfaction with the arrangement and show no purpose of terminating or changing it. There appears to have been no financial reason which would have made it necessary to have changed this arrangement. Her income was ample and more than sufficient to take care of her during her whole life. The income was so ample that the conservator felt it proper and desirable to continue, and even to increase, other allowances to people who benefited by her generosity, to the extent of a number of thousand dollars yearly.

"We are therefore clearly of the opinion that said Elizabeth A. Goddard would have continued said arrangement during her life, and that it was not only agreeable but, in a sense, beneficial to her. It enabled her to gratify her feelings of family pride and gave her the benefit of the services of Mr. Binney in looking after said estates and, to some extent, the benefit of the financial outlay made by Mr. Binney."

Without expressing any opinion as to its conclusions, we think it cannot be denied that the facts stated by the trial court are fully warranted by the letters of Mrs. Goddard to Mr. Binney and other evidence in the case. The respondent Mrs. Everett, as conservator, in her letters, one addressed to the trustees under the wills of Charlotte R. Goddard and Moses B. I. Goddard and the other to the trustees under the will of Moses B. I. Goddard, says that the occupation of the estates in question by Mr. Binney was no doubt in accordance with the wishes of Mrs. Goddard, the life tenant, when she was capable of managing her affairs. Again Mrs. Everett in her testimony says, in substance, that during a conversation with Col. R. H. I. Goddard in the early part of 1913, while she held a power of attorney from and was managing the affairs of Mrs. Goddard, Col. Goddard mentioned to her the matter of Mr. Binney's allowance and that she said in reply that she wished everything to continue as her aunt had wished it and that if she had been in the habit of giving $4,000 to continue it.

We are satisfied that it was within the power of either Mrs. Goddard or Mr. Binney, at least up to the time when the mind of the former became impaired, to terminate the arrangement between them regarding the Brown Street Estate and Hopelands. But neither of the parties requested its termination nor did either of them,' so far as appears, exhibit any desire that it should be terminated. The question now presented is, can we as a court of equity find in favor of the complainant on the ground that Mrs. Goddard, had she remained of sound mind, would have probably continued during the rest of her life, the same relations with Mr. Binney regarding the care of these estates. In other words, is the decree of the Superior Court justified in law?

We will now proceed to consider some of the authorities relied upon by the complainant to sustain his position and in so doing we may remark, in the outset, that it seems to us that we are called upon to make some distinction between those cases where relatives are otherwise unprovided for and the case at bar where the complainant is neither a relative nor a person requiring financial assistance, and that the language employed in some of the opinions must not be construed so literally as to altogether exclude the consideration of its relation to accompanying facts and circumstances.

In *ex parte Whitbread*, 2 Mer. 99 (1816) it is evident that the party petitioning was a blood relation who was unprovided for. In his opinion the Lord Chancellor said, "The court, in making the allowance, has nothing to consider but the situation of the lunatic himself, always looking to the probability of his recovery, and never regarding the interest of the next of kin. With this view only, in cases where the estate is considerable, and the persons who will probably be entitled to it hereafter are otherwise unprovided for, the court, looking at what it is likely the lunatic himself would do, if he were in a capacity to act, will make some provision out of the estate for those persons. So, where a large property devolves upon an elder son, who is

a lunatic, as heir at law, and his brothers and sisters are
slenderly or not at all provided for, the court will make an
allowance to the latter for the sake of the former; upon the
principle that it would naturally be more agreeable to the
lunatic, and more for his advantage, that they should receive
an education and maintenance suitable to his condition,
than that they should be sent into the world to disgrace him
as beggars."

In *Bradshaw* v. *Bradshaw*, 1 Jac. & Walk. 647, the object
of the petition was to obtain an allowance for an infant
who had an illegitimate brother born of the same father and
mother, and who was unprovided for.

In *re Earl of Carysfort*, 1 Cr. & Phill. 76, an annuity was
allowed out of the income of the lunatic's estate as a retiring
pension to an old personal servant of the lunatic who was
obliged to retire from his service by reason of age and
infirmity. Upon the inquiry of the Lord Chancellor as to
whether there was any precedent for such an allowance it
was admitted that no precedent could be found. The next
of kin consented to the order which was accordingly made.

In *re Frost*, 5 L. R. Chan. App. Cas. 699, there was a
weekly allowance made to relatives in consideration of their
poverty and upon evidence that the lunatic had intended
to do something for them, the amount allowed to be taken
into account against anything that they might ultimately
become entitled to from the estate of the lunatic.

In *re Heeney*, 2 Barb. Chan. 326 (N. Y.), the court granted
an allowance from the estate of the lunatic which was nec-
essary for the support and education of two young ladies
whom he had adopted into his family long prior to his dis-
ability and also for the support of an aged sister whom he
had supported for forty years, all of them being in need of
his support.

In *re Strickland*, 6 Ch. App. L. R. 226 (1871), lunatic was
tenant for life of London real estate producing income much
in excess of his needs. Three of his houses were sold to a
church for a church site, and his committee were solicited for

subscription for building the church and annexed schools. The master found that the improvements were needed in the neighborhood, and it was ordered that the committee might spend £250 toward the church and the same toward the schools. This case seems to go much further than some of the other cases cited by the complainant and is somewhat in conflict with the *Heeney* case, *supra*, the chancellor in that case saying, "I cannot authorize the committee to be the almoner of the general charities of the lunatic." The allowance in the *Strickland* case was not made to follow out what would have been the probable intention of the lunatic as evidenced by his own previous acts while sane, but was based upon the assumption that the lunatic would have made a charitable gift for the benefit of a church and schools, the establishment of which was not even contemplated during the period he remained competent to manage his own affairs.

In *Potter* v. *Berry*, 53 N. J. Eq. 151, a person of advanced years devised certain lands to his daughter, informing her and her husband of that fact and giving them possession of the lands, stating he desired the property to be held by them during his life. The father having become a lunatic, his guardian notified the daughter and her husband to yield up the premises, and upon their refusal filed a bill in equity, to which the son-in-law filed a cross bill setting up the above verbal agreement by the incompetent, and praying specific performance thereof. Also that the arrangement should be continued as a scheme of benevolence initiated and persevered in by the lunatic, and on the principle that the court should do for him in the administration of his estate, what, presumably, he would do himself if sane. The court held that equity would protect the daughter and husband in their possession, giving effect to the purpose of the lunatic as expressed while sane. The court further held, "The equities referred to are those inseparable from the fact that the lunatic, who is represented by the respondent on this appeal, had expressed during his sanity, in an un-

questionable form, his purpose that the appellants should remain in the possession of the premises in dispute during his own life. . . . For several years before the father-in-law's lunacy, the appellants continued in the occupation of the premises, spending considerable money in putting them in a productive condition. The son-in-law and the daughter who were thus provided for had a large family and were in somewhat straightened circumstances, and the father who thus established them was possessed of an estate that fully warranted his generosity. The question, therefore, arises whether, the father having lost his mind, this benefaction of his towards his own child is to be frustrated and revoked by his guardian."

In re *Hambleton's Appeal*, 102 Pa. St. 50, an old man, a widower without children, took a nephew and his family to live with and take care of him and his estate, paying the nephew a salary and supporting the nephew and his family as part of his household. Subsequently he became demented and was adjudged a lunatic. A committee of his estate was appointed by the court and the nephew was appointed committee of the person. The latter fulfilled his duties in a satisfactory manner and received from the committee of the estate a sufficient monthly allowance to continue his household in the same manner as before the lunacy and also an allowance for his salary. Upon the audit of the nephew's account, the auditor and the court surcharged him with one-half the cost of food for the household and the wages of one servant.

On appeal it was held that the committee had done that which it might reasonably be supposed the lunatic would have continued to do if he had retained his sanity, and which was apparently best adapted to the peace and comfort of the lunatic and that it was error to surcharge the accountant with any part of the cost of maintaining the lunatic's household. In the course of its opinion the court said, "At the earnest and long continued solicitation of Neal, the appellant had agreed that himself and his wife

and children should form Neal's family. In order to meet the wishes of his uncle, in this particular, and devote himself exclusively to his uncle's interests, he was obliged to give up a lucrative business in which he was then engaged, and, as a compensation for this sacrifice, he was to receive a salary of fifteen hundred dollars a year. All these matters were thus settled by Neal, when of sound mind, to his own satisfaction and for his own welfare and protection in his old age. . . . It must not be forgotten that the court is administering the lunatic's own estate, and that his personal comfort and welfare are the prime objects which are to be kept in view, and not the welfare of his next of kin. . . . Although the memory has become feeble and treacherous, old habits and old associations still continue to exert their influence in adding to the peace and comfort of the old man's life." See also *Re Reed,* 18 Misc. Rep. 285.

In 19 Halsbury's laws of England, § 909, p. 438, it is stated, "In deciding whether to make an allowance out of a lunatic's estate to relations for whom he is not bound to provide, the court is guided by a consideration of what the lunatic himself would probably have done if sane. Assuming the existence of an ample margin beyond the lunatic's personal requirements, the continuation of allowances, originated by him, to those to whom he stands in *loco parentis* is authorized almost as a matter of course, and in a proper case the court would itself originate such allowances. Further than this, allowances to other near relations, such as collaterals, may be made where special claims for consideration can be put forward. But it must always be borne in mind that it is not the duty of the court to deal benevolently or charitably with the patient's surplus income, and that the tendency should be towards narrowing rather than augmenting voluntary allowances."

In 14 R. C. L. 579, there is a general statement of the law as to allowances from estates for other than legal obligations as follows: "A court of equity has power out of the surplus income of the estate of an insane person to provide for the

support of persons whom the insane person is not under legal obligation to support, where it specifically appears that the insane person himself would have provided for such support had he been sane. The court in making such allowances acts for the insane person as it supposes he himself would have acted if he had been of sound mind, and the amount and proportion of allowances thus made rest entirely within the discretion of the court. The power of the court to make allowances out of the estate of an insane person for the purpose of carrying out the presumed wishes of such person extends to the case of donations for charitable and religious purposes, but it has been held that the committee or guardian will not be allowed personally to expend any part of the estate for general charity or objects of benevolence or piety for which the insane person himself had not been in the habit of contributing specifically and regularly while sane."

It will be observed that nearly all of the authorities cited by the complainant and upon which he bases his claim for the continuation of the allowance, covering the period of Mrs. Goddard's disability and up to the time of her death, are largely founded upon conditions which do not obtain in the case at bar. These cases provide for the support of the family of the lunatic; for the support of blood relations in indigent or in straightened circumstances; and, in one case, for the support of an old personal servant compelled to retire by reason of age and infirmity. None of these elements are to be found in the present suit. In the case of *Strickland, supra,* the court authorized a subscription for the building of a church and schools which had not even been projected prior to the insanity but this was done on the petition of the committee, who was next of kin and heiress at law to the lunatic, upon the theory that the erection of such buildings would enhance the value of the remaining property and, therefore, it is of little value as an authority in the present case.

As stated by the Lord Chancellor in *re Blair*, 1 Myl. & Cr. 300, we think that courts in making such allowances should act with the greatest jealousy and caution and that the principle involved should be narrowed rather than extended in its operation and this view has received the sanction of other courts.

The respondents claim that under the circumstances of the present case there is no sufficient reason why Mrs. Goddard's allowance to the complainant should be continued after her incompetency; that the complainant is a prosperous man; that he was not a relative of or next of kin to Mrs. Goddard; that the arrangement was not made to furnish him with support nor was it made to keep up a home for Mrs. Goddard; all of which appear to be undisputed facts.

The respondents cite a number of cases where allowances out of the estate of the lunatic have been refused.

In *re Grove*, 13 L. J. Ch. (N. S.) 262, a petition by the committee, sister and sole next of kin of a lunatic, to apply part of the lunatic's income for the purpose of support of illegitimate children of the lunatic's deceased brother was denied. The Lord Chancellor disregarded a suggestion of the petition that the lunatic would no doubt have also contributed toward their support if she was not incapable of doing so. The court increased the allowance to the lunatic on the ground that her income had increased, expressly stating that, "it must be understood, that the increase was not made from any consideration of the illegitimate children of the lunatic's brother."

In *re Earl of Lanesborough*, 7 Ir. Eq. 606, an allowance out of the estate of a lunatic to assist in educating children entitled to the estate in remainder was refused.

In *re Evans*, 21 Chan. Div. 297, where the lunatic's committee approved an application by a respectable, aged clergyman, who was a first cousin and next of kin of the lunatic, for an allowance and it appeared that the lunatic had a large surplus income and that the applicant was in

great need and a worthy man, the application was refused. The opinion says, "I concur with Lord Cottenham in thinking that the practise of giving away a lunatic's property ought to be narrowed rather than extended. It is not the province of this Court to give general charity at the expense of a lunatic's estate.", to which Lindley, L. J. added, "The Court ought not to give away a lunatic's property for the benefit of other people, it ought to act only with a view to the benefit of the lunatic."

In re *Willoughby*, 11 Paige 257, the court refused a petition by the lunatic's wife for an allowance out of his income to support a girl who, like the complainant, was not a relative of the ward. She was, however, his stepdaughter and either was or shortly before had been a member of his household. It appeared that there was reason to suppose that the proposed beneficiary had some property of her own which would be sufficient for her support with the addition of what she could obtain by her own exertions.

In re *Kernochan*, 146 N. Y. S. 1026, the petitioner who was in no need of financial assistance applied for an allowance from the estate of an incompetent aunt. He was a blood relative. The court refused to make the allowance and in the course of its opinion said: "The law may be briefly stated. Before an allowance may be granted from an incompetent's estate to one to whom the incompetent owes no duty of support, it must be established that the incompetent if sane would make the allowance. The proof required is that the incompetent should have known the applicant and should have indicated while sane by acts or words that he or she had such an intention to support the applicant; or that such facts and circumstances be made to appear as would show beyond a reasonable doubt that the incompetent if sane, would assume such a burden. The courts are required to scrutinize the evidence submitted upon such an application with caution, recognizing that such applications should be narrowed and discouraged rather than extended or encouraged. There must exist a real need or a necessity

upon the part of the applicant to be provided for, the court being mindful that it does nothing wantonly or unnecessarily; and, finally, it is not the duty of the court to deal benevolently or charitably with the property of the incompetent."

In re Darling, 39 Chan. Div. L. R. 208, the lunatic was a bachelor eighty-two years of age, whose next of kin were six cousins ex parte paterna and four cousins ex parte materna. When sane he had been in the habit of making small allowances to three of those cousins who were in humble circumstances. The master in lunacy recommended that the allowances be increased and that further allowances should be made to three other cousins, all of them being in impecunious circumstances. The court refused to sanction an increase of the allowances already made or further allowances to others, and said in its opinion, "Undoubtedly we do sometimes make considerable allowances for persons who have legal claims upon a lunatic, such as a son or a daughter, and also for persons who have moral claims upon him. But it is not our business to deal benevolently or charitably with the property of the lunatic. . . . Applications for allowances of this kind ought to be discouraged rather than encouraged. . . . Now to make such an order would, in my opinion, be contrary to the principles on which the Court acts in administering the property of a lunatic."

In a number of cases, including some of those which we have cited and others which we have examined, allowances have been granted with hesitation and sometimes upon conditions requiring repayment, the beneficiary not being in indigent circumstances or incapable by reason of age or infirmity. Re Blair, 1 Myl. & Cr. 300, 302; Re Croft, 32 L. J. (N. S.) Ch. 481; Re Darling, 39 L. R. Ch. Div. 208; Re Frost, 5 L. R. Ch. App. 699; Re Sparrow, 20 L. R. Ch. Div. 320; Re Fowler, 6 Jur. 431.

As we view the authorities, the complainant's case comes to rest upon the assumption that Mrs. Goddard, had she remained sane, would have continued the arrangement,

under which the complainant had occupied and cared for
the estates in question, during the remainder of her life,
an assumption which is chiefly supported by the fact that it
had previously existed for a considerable period. Without
admitting that such an assumption, if warranted, would
bring the case within the purview of the authorities which we
have hereinbefore discussed, we think that the probability
of such an intention, on the part of Mrs. Goddard, must
appear with reasonable certainty to entitle it to grave
consideration. We do not think that the evidence in this
regard is sufficient to carry us to the conclusion which the
complainant craves.

It is evident that Mrs. Goddard had been somewhat
disturbed from time to time, previous to her disability,
respecting the expenses attending the care and management
of these estates, particularly Hopelands, and that more than
once she had considered the advisability of making some other
arrangement, less expensive, which would exclude the com-
plainant. While Mrs. Goddard did not carry into effect
either of the plans for retrenchment to which she had made
allusion and which would have brought about the displace-
ment of the complainant, it is evident from her last two
letters to him that she was still annoyed and worried over
the matter of expenses although such letters contain no
expression from which it could be reasonably inferred that
she entertained any ill feeling toward the complainant or
considered him responsible for the situation. Under the
circumstances of this case we do not think that we would be
justified in concluding that Mrs. Goddard would have con-
tinued the arrangement with the complainant during the
remainder of her life had she remained competent to conduct
her affairs.

We have thus far discussed this case without taking into
account that in some of the jurisdictions from which authori-
ties have been cited by the complainant there may be, as
claimed by the respondent, statutes conferring greater
powers than are vouchsafed to us under the statutes of

Rhode Island. It does not seem necessary to the present case that we should prolong this opinion by a specific consideration of the broader statutes which have been enacted in some other states for the purpose of pointing out the differences between them and the enactments of our own state relating to the management and control of the property of persons *non compos mentis.*

Thus far in our discussion of this case, and particularly in our consideration of the authorities cited, we have not been unmindful of the respondents' argument that the Superior Court, having found there were no contractual relations between the complainant and Mrs. Goddard, had no jurisdiction to exercise its discretion and order the payment of $9,000 to the complainant solely on the ground that the arrangement between the parties would have been continued except for the occurring disability of Mrs. Goddard, and that in so doing, in the absence of an obligation upon one side and a right upon the other, it would exercise a sovereign rather than a judicial power.

In *Mitchell* v. *Peoples Savings Bank,* 20 R. I. 500, this court said, "At the time of the adoption of the constitution, jurisdiction generally, in matters relating to the appointment of guardians and affecting the relations of guardians and wards, was vested in Courts of Probate. The jurisdiction exercised by the English courts of chancery, over guardians and wards, did not arise because the appointment of guardians and the management and settlement of the estate of the ward presented questions that necessarily called for an exercise of the power of equitable interpretation or the application of equitable remedies, but because it was necessary that those persons, unable properly to care for themselves, should be cared for by the sovereign authority; and, therefore, in the absence of jurisdiction specifically conferred upon any tribunal, the court of chancery, representing the king in his quality of *parens patriæ,* extended and exercised its jurisdiction over guardians and wards. In the United States the appointment of guardians and the man-

agement and settlement of the estates of persons under guardianship has never been peculiarly within the jurisdiction of chancery courts. . . . In Rhode Island, long (2) before the adoption of the constitution, the General Assembly had placed persons unable to care for themselves, together with their estates, in the care of Courts of Probate. The general powers thus conferred upon Courts of Probate were not, at the time of the adoption of the constitution, and never since have been, deemed to be chancery powers."

It would therefore seem that the Superior Court had no inherent power to deal with the estate of Mrs. Goddard as it has attempted to do and that such a power, if existent, must be found in some statutory enactment by which it is clearly conferred. Our statutes defining the powers of the Superior Court do not invest it with any such authority and we must therefore conclude that it had no jurisdiction to order the payment of $9,000 to the complainant.

Our statutes defining the powers of the Superior Court do not invest it with any extraordinary authority like the statutes of some of the other states. Our statutes are ex-(3) plicit as to the purposes for which the estate of an incompetent may be appropriated. They do not confer any discretion to grant or continue donations after incompetency which the incompetent was under no obligation to make or continue. They only provide for the disposition of the estate for the purposes of paying the incompetent's debts and the claims of creditors; of defraying the expense of supporting the incompetent and his family, including the expense of institutional care; of making sales of his property; and of paying the expenses incurred in connection with the guardianship proceedings, including the guardian's compensation.

We do not think that we need to discuss further the question of jurisdiction. There were no contractual relations between the complainant and Mrs. Goddard. We have also reached the conclusion that the evidence does not warrant a finding that the arrangement between these parties

would have been continued for the remainder of Mrs. Goddard's life had she retained her mental faculties. If, however, the contrary be assumed we would still be unable to say that the court would be empowered to grant the prayer of complainant's bill.

The respondent Mrs. Everett, as conservator and executrix, alleges in her reasons of appeal that the decree of the Superior Court is erroneous in that it fails to provide for the ascertainment and the payment by the complainant to the respondent of a fair rental from January 1, 1918 to October 18, 1918 for the use and occupation of these estates, that being the period between the date of Mrs. Everett's notice, as conservator, to the complainant that his occupancy of the estates would be terminated and the death of Mrs. Goddard. We think that if Mrs. Everett desires to prosecute this matter she must do so in another proceeding.

The respondents' appeal is sustained, the decree of the Superior Court is reversed and the cause is remanded to that court with direction to dismiss complainant's bill.

Sweetland, C. J., and Rathbun, J., concur in the result of the opinion of Mr. Justice Vincent that the respondents' appeal be sustained and that the decree of the Superior court be reversed; but we would not be understood as giving approval to the principle that the doctrine of the English courts of chancery expressed in *Ex parte Whitbread,* 2 Mer. 99 (1816), and followed in other English cases has any application in this jurisdiction. The power which the English courts exercised over the estates of insane persons arose not because the management of such estates required the application of equitable principles but because courts of chancery in England early acquired jurisdiction of the persons and estates of insane persons and infants, either as the representative of the King, who by an early statute was given the custody of idiots, or by usurpation as is the conclusion of some authorities. In this state however no such power is vested in a court of equity and a consideration of

*Ex parte Whitbread, supra,* and cases following it is without pertinency. We fear that a number of expressions contained in the opinion of Mr. Justice VINCENT may be understood as an approval of the doctrine that in this state a court of equity may be justified in some cases in ordering a gratuity to be paid from the estate of an insane person to his relatives or to a needy person who has been the recipient of such lunatic's bounty while he was of sound mind. The action of the court in sustaining the appeal is based solely upon the ground that in this state jurisdiction over the persons and estates of insane persons is vested in courts of probate and not in the Superior Court as a court of equity.

*Green, Hinckley & Allen, Frederick W. Tillinghast, Clifford A. Kingsley,* for complainant.

*Eliot G. Parkhurst, Edson K. Smith, Edwards & Angell,* for respondents.