In re Irénée duPont.

*New Castle, October 16, 1963.*

*S. Samuel Arsht,* of Morris, Nichols, Arsht & Tunnell, Wilmington, for guardians Crawford H. Greenewalt and Irénée duPont, Jr.

*Daniel L. Herrmann,* of Herrmann, Bayard, Brill & Russell, Wilmington, amicus curiae.

SEITZ, Chancellor: Irénée duPont, Jr. and Crawford H. Greenewalt, the court-appointed guardians ("guardians") under 12 *Del.C.* § 3914 of the property of Irénée duPont ("ward"), petitioned this court for authorization to make certain gifts of his assets to his children and grandchildren by way of an inter vivos trust. The court fixed a hearing thereon after notice to the ward's children and to his grandchildren who were 18 years of age or older. Because it appeared likely that there would be no opposition to the guardians' petition and because of the importance and novelty of the problem implicit therein, the court appointed an amicus to report on the law, possible relevant evidence and related matters. This exhaustive and

helpful report was filed and made available to the court and the noticed parties before the hearing. The guardians' request was not opposed at the hearing at which the guardians offered evidence in support thereof.

Here are the facts as I find them with due recognition of the ex parte nature of the proceeding and the relationship of the petitioners to the other interested persons.

The ward, who is 86 years of age and a widower, is totally and permanently disabled, both mentally and physically, due to advanced age. He has eight living children all of whom are of age and all have issue. There is no problem of "need" as to any of the children or grandchildren. Under the terms of the ward's will the remainder of his estate, after certain bequests to charities, is left in trust to be treated as composed of as many equal shares as there may be children of the ward living at the time of his death or who have predeceased him leaving issue living at his death. As to each share for a child surviving the ward, the income is distributed to each such child for life and at death the principal and undistributed income is paid over to the then living issue of that child in equal parts, per stirpes, with a trust for minor issue. As to each share for a child predeceasing him leaving issue surviving the ward, the principal is distributed outright at the ward's death to such issue in equal parts, per stirpes, with a trust for minor issue.

The guardians request that they be authorized to give certain assets of the ward, now valued at about $36,000,000, to the children and grandchildren under an inter vivos trust which, except for the fact that it would be a present gift, would conform in all substantial ways to the terms of the ward's will. If the gift is authorized, the estate would be required to pay a gift tax thereon of about $21,100,000. Thus the total depletion of the ward's estate by the action here sought to be authorized would be about $57,000,000.[1a] The action, if authorized, would not affect the charitable bequests.

---

1a. Plus any capital gains tax on assets sold to pay the gift tax.

The present value of the ward's estate is about $176,000,000 which produces a gross cash income of $5,800,000 [1] annually and a net disposable after-tax annual income of approximately $800,000. An after-tax income of $200,000 per year is and will for the expected life of the ward be ample to meet his requirements with full recognition of the manner in which he is accustomed to live. The ward has no dependents, and thus income in the amount of $600,000 a year is accumulating. His children and grandchildren are the only possible beneficiaries of such accumulation under the ward's will.

After allowance for charitable contributions and expenses the ward's net taxable estate at present values would be about $135,200,000. At the ward's death such an estate would be required to pay estate taxes of about $102,000,000. This would compel the executors to sell at least 239,700 shares of the ward's principal asset, being 542,000 shares of Christiana Securities Company common stock. The sale of such a large amount of Christiana stock in such a relatively short period (15 months) would most probably result in a loss due to blockage. The loss due to blockage plus the expenses of sale would amount to between 7½% and 10% of its market value. Any sale of such stock during the ward's lifetime would require a substantial capital gains tax payment, because the ward's tax base on his Christiana Securities stock is now zero.

It appears that the requested transfer, if authorized, would provide the children and grandchildren with a much greater benefit from the ward's assets than would be the case if all the assets were to pass under the ward's will. The basis for this statement follows. The gift tax on 160,000 shares of Christiana Securities common at present values comes to approximately $21,100,000. Once the gift tax is incurred, the value represented thereby would not be includible in the ward's estate for purposes of computing the estate tax even though the gift might be considered to be in contemplation of death. As a credit is given on the estate tax for the amount of the gift tax,

---

1. This does not include the value of General Motors stock received as a distribution from Christiana Securities Company as a result of the decree in the so-called DuPont-General Motors anti-trust case.

the family would receive a benefit which is equal to the amount of funds which would have been required to pay an estate tax on the amount of the gift tax. In this instance it amounts to 77% of approximately $21,100,000 or about $16,100,000. The benefit to the family will be even greater if the gift should, for tax purposes, not be found to have been made in contemplation of death—an issue which it is not for this court to decide.

The ward was a business man of great experience and responsibility who was sophisticated in the ways of taxes. He also had the continuing assistance of competent tax advisers. Years ago (1924-26) he made very substantial gifts to his family and over the years since has made sizeable gifts to them. The pattern of such giving indicates that all of the children and grandchildren were equally the objects of his affection.

The ward executed his Last Will and Testament on August 12, 1948. At or about that time he was concerned about the planning of his estate. His estate was then worth about $42,000,000. A letter dated August 23, 1948, was admitted in evidence which he, with the assistance of an employee knowledgeable in tax matters, had caused to be prepared for delivery to his wife. A copy was given to his son-in-law, Crawford H. Greenewalt. In this letter the ward disclosed the contents of his will and further stated, "I intend, while living, to dispose of, by gift, enough of my property to reduce my total estate to about thirty million dollars". The ward had in his record a chart which reflected the effect of this and other proposed distributions.

In his letter of August 23, 1948, the ward also proposed that both he and his wife take advantage of the recently enacted marital deduction provision of the federal estate tax law. He suggested that she distribute the Christiana Securities stock she was to receive from him as a marital deduction gift, if she survived him, to their children and grandchildren and that the other securities composing such gift be liquidated to pay the gift tax on the distribution. Also, he suggested that by her will she bequeath to him the maximum marital deduction gift so that he in turn could use such funds to pay the gift

tax on gifts which he proposed to make to their children and grand-children in the event she predeceased him. The ward indicated that this latter proposal would result in their issue receiving a much larger proportion of their total estates than would otherwise be possible.

Several other documents were offered which indicated the ward's concern for the most advantageous distribution of his and his wife's estates, his apparent knowledge of the tax considerations involved, and his appreciation of the practical difficulties involved in disposing of his large holdings of Christiana Securities.

Considering the increase in the value of the ward's estate since that date, it appears that the present request, if authorized, will not reduce his estate even as much proportionately as the earlier inter vivos distribution which he visualized. Ultimately, however, while the ward thereafter made substantial gifts from income to members of his family and to numerous charities, he never instituted his plan of distributing Christiana stock to his children and grandchildren, even though he reviewed the described documents as recently as June 1960. At that time he caused certain documents including a copy of the letter of August 23, 1948, to be delivered to his son and two of his sons-in-law.

Since the ward was in command of his faculties for a number of years after the plan was prepared, one asks why he did not carry out his plan of inter vivos giving in the intervening years. There is no direct evidence on this point, but I believe a fair inference from the evidence is that the ward probably deferred giving the Christiana Securities stock to his children and grandchildren primarily because of the DuPont-General Motors anti-trust action which was pending from 1949 to 1962. While the litigation did not prevent the making of such gifts, it is reasonable to infer that the ward did not do so because he felt that it would have been "bad tactics". This is so be-cause he, and others, were defendants therein and were accused of having pursued a course of conduct designed to keep control of the DuPont Company "in the family".[2] I express no opinion, of course,

2. Christiana's assets consist largely of DuPont Company common stock.

on the relevancy of such evidence to the issues in the anti-trust action, but I realize that the ward could reasonably have concluded that he ought not provide evidence which might be used in support of the Government's contention. By the time the anti-trust litigation terminated the ward was no longer legally capable of making inter vivos gifts.

I conclude from the evidence that the ward, if he had possessed the capacity to do so, would by now have made substantial gifts of Christiana Securities stock to his family so as to increase the amount of his assets which they would ultimately receive. He would have accomplished this by inter vivos gifts because he was aware of the tax advantages of so doing.

Does this court have the power to authorize the guardians to execute the trust instrument which I find would reasonably carry out my finding with respect to the probable wishes of the ward?

The jurisdiction of the Court of Chancery over the property of aged, mentally infirm, and physically incapacitated persons is conferred by 12 *Del.C.* § 3914. While the Court of Chancery has long asserted jurisdiction over the persons and property of the mentally ill, it is generally agreed that such jurisdiction is derived solely from legislative enactments. In re *Bohnstedt,* 36 *Del.Ch.* 97, 125 *A.2d* 580; In re *Reeves,* 10 *Del.Ch.* 483, 94 *A.* 511, *affirming* 10 *Del.Ch.* 324, 92 *A.* 246; In re *Harris,* 7 *Del.Ch.* 42, 28 *A.* 329.

The portion of § 3914 that is controlling with respect to the matter now under consideration is sub-section (d):

"(d) In all matters relating to the appointment, qualification, duties, powers, liability to account, and distribution of property at the recovery or death of the ward, such guardian shall be governed by all of the applicable provisions of law and rules of Court relating to the management of the estates of mentally ill persons."

The "applicable provisions of law" referred to in subsection (d) which are relevant here are 12 *Del.C.* §§ 3701 and 3705:

"§ 3701. Jurisdiction to appoint trustees for mentaly ill persons.

"The Court of Chancery shall have the care of mentally ill persons above the age of 21 years, so far as to appoint trustees for such persons to take charge of them and manage their estates."

\*　　\*　　\*

"§ 3705. Powers of trustee.

"A trustee may, in the name of the mentally ill person, do whatever is necessary for the care, preservation and increase of his estate."

▮ I think it fair to say that § 3914(d) was intended to vest this court with the same powers over the property of aged, mentally infirm, and physically incapacitated persons as it had theretofore exercised over the property of the mentally ill.

I come now to consider the scope of that power. The guardians urge that the controlling principle in this area is that the court, once it obtains jurisdiction, will substitute its judgment for that of the incompetent where his interest is concerned and will do for him as he would probably have done for himself, if competent. Certainly the language of the statute is very broad and does not lay down any precise test. The court then must see what gloss, if any, has been placed on this language by the decided cases.

I turn first to the Delaware authority. In In re *Reeves,* 10 *Del. Ch.* 324, 92 *A.* 246, a trustee appointed for an incompetent petitioned for leave to sell the land which his ward held as tenant in tail and to dock the entail by conveying such land as a fee simple. After observing that the right to elect to dock the entail was a right personal to the tenant and that the Court of Chancery had the power to make such an election for the incompetent, Chancellor Curtis stated,

"\* \* \* But independent of these considerations [i.e., the general equitable powers of the Chancery Court] broad powers are given by statute to the court to care for insane persons and their property. The trustee appointed by it to manage the property of the

lunatic is expressly empowered by the statute to do 'whatever is necessary for the care, preservation and increase of his estate'."

On Appeal, the Supreme Court (10 *Del.Ch.* 483, 94 *A.* 511) affirmed the Chancellor's decision on different grounds. Thus, the Supreme Court had no occasion to discuss at length the general scope of the powers granted by the statute in question here.

No other reported opinion of a Delaware court, with the exception of In re *Schwartz* (later discussed), has attempted to delineate the general scope of such powers. See *Equitable Trust Co. v. Union National Bank,* 25 *Del.Ch.* 281, 18 *A.2d* 228; In re *Schwartz,* 27 *Del.Ch.* 223, 34 *A.2d* 275; In re *Cain,* 108 *A.2d* 578 (*Del. Orphans' Ct.*). In In re *Emory,* 31 *Del.Ch.* 266, 70 A.2d 714, Chancellor Harrington merely referred to the broad construction placed on what is now § 3705 by the Chancellor in the *Reeves* case.

What then is the proper view of the scope of the power vested in this court by the statute? The particular provision we are concerned with is very old, dating back to 1793. 2*Del.Laws* 1055. But having in mind the purpose which it was intended to serve, I think that that construction is most appropriate which gives the court considerable latitude in managing the affairs of an incompetent for his benefit. After all, unless there were some element of flexibility here, the court would be unable to deal adequately with different conditions and circumstances as they arise. One need only consider the constantly evolving "tax climate" to gain some insight into the scope of the court's responsibility.

■■ That is not to say, however, that the court's powers of management are unrestrained. "The governing principle in the management of the estate, applicable generally, is the lunatic's interest * * *". In re *Reeves,* 10 *Del.Ch.* 483, 94 *A.* 511. The trustee acts as a substitute for the incompetent, in his name, under the direction and with the approval of the court, doing "whatever is necessary for the care, preservation and increase of his estate". In re *Reeves, supra.*

I do not think that the enactment of separate statutory provisions authorizing the sale of real estate by the trustee and investment

of the proceeds (§§ 3706 and 3707) detracts from the wide scope of powers envisaged by § 3705. Those provisions were apparently enacted at a very early date (1839) to remove any doubt with respect to the court's power as to those particular matters. See 44 *C.J.S. Insane Persons* § 93b. Prior to that time such sales were authorized by *Private Act of the General Assembly.* See 5 *Del.Laws, Ch.* 134, p. 233. These provisions cannot fairly be read, in my opinion, as circumscribing what would otherwise be a broad grant of power under § 3705 empowering the trustee, under the court's supervision, to manage the ward's estate.

Having in mind then the wide power conferred on this court by § 3705, I come next to consider what principles govern the exercise of such power in granting or denying the application made in the present case.

There is a long line of English and American cases dealing generally with the question whether a court having jurisdiction over the property of an incompetent may permit distributions to be made from his estate to persons otherwise having no lawful claim upon his property. The English decisions, beginning in 1816, have uniformly held that within certain limits the court may authorize such distributions.

The governing principle was first announced by Lord Eldon in *Ex parte Whitbread, 2 Mer.* 99, 35 *Eng.Rep.* 878. In that case the Lord Chancellor authorized certain payments out of the ward's estate for the benefit of his brothers and sisters who were found to be in need. While such payments were obviously beneficial to the recipients, the Court observed that the justification for them lay in the fact that under the circumstances there present the payments were also of advantage to the ward and only accomplished what the ward himself would probably have done, if sane.

Lord Eldon observed, in pertinent part,

"The Court does nothing wantonly or unnecessarily to alter the Lunatic's property, but on the contrary takes care, for his sake, that, if he recovers, he shall find his estate as nearly as possible

in the same condition as he left it, applying the property in the meantime in such manner as the Court thinks it would have been wise and prudent in the Lunatic himself to apply it, in case he had been capable.

"The difficulty I have had was as to the extent of relationship to which an allowance ought to be granted. I have found instances in which the Court has, in its allowance to the relations of the Lunatic, gone to a further distance than grandchildren—to brothers and other collateral kindred; and if we get to the principle, we find it is not because the parties are next of kin of the Lunatic, or, as such have any right to an allowance, but because the Court will not refuse to do, for the benefit of the Lunatic, that which it is probable the Lunatic himself would have done."

Parenthetically, it is perhaps noteworthy that Lord Eldon confirmed the allowance in that case at a time when the Lord Chancellor's authority over the property of incompetents was governed by the Statute, *De Praerogativa Regis,* 1326, 17 *Edw. 2.* That statute was, if anything, narrower in scope than 12 *Del.C.* § 3705, providing only that the incompetent and his Household should "live and be maintained" with the Profits of his estate. (Compare *Kelly v. Scott,* 215 *Md.* 530, 137 *A.2d* 704, which construed 17 *Edw.* 2 as precluding in Maryland the application of the Whitbread doctrine.)

Subsequent English decisions followed the principle laid down in *Ex parte* Whitbread and indeed amplified it. In *In re Earl of Carysfort,* 1 *Cr. & Ph.* 76, 41 *Eng. Rep.* 418, an annuity was allowed out of the income of the incompetent's estate as a retiring pension to an old servant of the incompetent, who was obliged to retire from his service by reason of age and infirmity. The Lord Chancellor (Cottenham) permitted the allowance, though no supporting precedent could be found, since it appeared that the ward would probably have given his approval if he were competent. In *In re Strickland,* L.R. 6 *Ch.* 226, the doctrine was extended to encompass charitable gifts which it appeared the incompetent would probably have made, if sane.

In all of these cases the recipients had no legal claim against the incompetent for support, though in most cases such persons were related to the incompetent by blood or marriage. In every case, except perhaps in *In re Whitaker, L.R. 42 Ch.D.* 119, considered later herein, the allowances were made from "income" in excess of what was needed for the care and maintenance of the incompetent. In several of the cases involving allowances to next-of-kin or to a remainderman, *e.g., In re Sparrow, L.R. 20 Ch.D.* 320, the court ordered the sum distributed to be treated as an advancement or as a charge on the remainder interest.

One further observation I think is pertinent here. "Need" in the sense that the persons seeking an allowance would otherwise have been impoverished does not seem to have been a controlling circumstance in each instance in these English cases. While the indigence of the applicant seems to have been a persuasive factor in determining what the attitude of the incompetent would probably have been, the court did not refuse to give its approval where some clear course of conduct otherwise existed which indicated what the incompetent would have done. *In re Frost, L.R. 5 Ch.* 699; *In re Jodrell, Shelford* on *Lunacy,* 161; *In re Mackenzie,* 43 *L.T.* 681.

In *In re Whitaker, L.R. 42 Ch.D.* 119, the principle laid down in *Ex parte Whitbread* was given perhaps its broadest application. There a merchant suffered a sudden attack of *angina pectoris* while in the act of changing his will. As a result, Whitaker, already a rich man, received the sum of £400,000 which the merchant had intended to give to the petitioner. Recognizing his "debt of honour", Whitaker gave the petitioner a voluntary promissory note for £50,000 and by the time he became insane had paid three yearly installments of £5,000 each. The court found that the actions of the incompetent, both before and during his incompetency, demonstrated his intention to pay the full amount. The court, while acknowledging the absence of any legal obligation, awarded the petitioner the balance of the sum due:

> "Here the amount which is asked for is very large, and at first sight looks somewhat startling; but then we must recollect

that the lunatic, who was already a rich man, had, in consequence of the accident which had occurred, got a very large personal property, stated to be something like £400,000. In my opinion we should be perfectly justified in simply performing, or enabling the committee of the lunatic to perform, for the lunatic that which, when he was of sound mind, he intended to do."

The rule announced by Lord Eldon has been recognized or adopted in a number of American states. It has been rejected in others. See *Notes* 34 *L.R.A.* 297, 59 *A.L.R.* 653, and 160 *A.L.R.* 1435. See also *Notes* in 8 *Harv.L.Rev.* 472; 41 *Harv.L.Rev.* 402; 54 *Harv.L.Rev.* 143; 2 *Va.L.Rev.* 204; 17 *Calif.L.Rev.* 175; 14 *Cornell L.Q.* 89.

An analysis of the American case law in this area is helpful in arriving at a proper construction of the Delaware statute. The New York cases, beginning with *In re Willoughby,* 11 *Paige* 257 (1844), recognize the rule and follow the English pattern in applying it. It appears moreover that the New York Chancery Court's power over the person and property of an incompetent was governed in 1844 by a statute much like 17 *Edw.* 2, referred to above, which regulated the authority of Lord Eldon in 1816. Compare *In re Salisbury,* 3 *Johns.Ch.R.* 347. The New York courts have continued to give effect to the Whitbread principle notwithstanding the enactment of specific statutes in this general area. See *In re Schley,* 201 *Misc.* 522, 107 *N.Y.S.2d* 884. In two instances at least, allowances have been awarded from "principal", the court declaring that the primary consideration in such cases was what the incompetent would probably have done, if sane, and not the source from which the payments were to be made. *In re Fleming's Estate,* 173 *Misc.* 851, 19 *N.Y.S.2d* 234; *In re Bond,* 198 *Misc.* 256, 98 *N.Y.S.2d* 81. I also note that in *In re Flagler* (Application of Moore), 130 *Misc.* 554, 224 *N.Y.S.* 27, the New York Court rejected the requirement imposed in *In re Kernochan,* 84 *Misc.* 565, 146 *N.Y.S.* 1026, that the incompetent's probable intention be proved by an applicant beyond a reasonable doubt.

Similarly, other American jurisdictions have adopted this so-called substitution of judgment doctrine, though not perhaps carrying

it as far in application as the courts of New York. *In re Brice's Guardianship*, 233 *Iowa* 183, 8 *N.W.2d* 576; *In re Buckley's Estate*, 330 *Mich.* 102, 47 *N.W.2d* 33; *State ex rel. Kemp Guardian v. Arnold*, 234 *Mo.App.* 154, 113 *S.W.2d* 143; *Potter v. Berry*, 53 *N.J. Eq.* 151, 32 *A.* 259, 34 *L.R.A.* 297; *Hambleton's Appeal*, 102 *Pa.* 50; *In re De Nisson*, 197 *Wash.* 265, 84 *P.2d* 1024. It may be said generally that in none of these cases was there a statute expressly granting the power sought to be exercised by the court.

In each of the jurisdictions rejecting the Whitbread doctrine the court involved, while recognizing the principle, concluded that the statute governing the powers of the court over the property of an incompetent was restrictive in nature and did not permit a general application of the rule. *Kelly v. Scott*, 215 *Md.* 530, 137 *A.2d* 704; *Lewis v. Moody*, 149 *Tenn.* 687, 261 *S.W.* 673; *Binney v. Rhode Island Hospital Trust Co.*, 43 *R.I.* 222, 110 *A.* 615. In *Bullock Estate*, 10 *Pa.Dist. & Co.R.2d* 682, the court refused to permit an *inter vivos* distribution of a portion of the incompetent's assets for the purpose of minimizing estate taxes otherwise payable on his death, noting that the power and authority of the guardian were circumscribed by the applicable statutory provision. The views of these courts on the matter are of course not persuasive here in the light of the broad language of the Delaware statute. To the extent that the Bullock case suggests that "tax avoidance" is not a legitimate basis for authorizing a distribution of the ward's assets, I can only say that that factor is pertinent only insofar as it assists the court in determining what the incompetent would probably have done.

In 12 *Del.C.* § 3710 the legislature of this State gave recognition to the principle announced in *Ex parte Whitbread* in empowering the Court of Chancery to authorize charitable contributions from the income of an incompetent's estate. Sub-section (c) of § 3710 expressly provides that that section shall not be construed as abridging the existing powers of the Court over the estates of such persons.

There is one other Delaware authority which requires comment in this connection. I refer to *In re Schwartz*, 27 *Del.Ch.* 223, 34 *A.2d* 275. In that case an earlier Chancellor had authorized the trustee

for the mentally ill ward to make stipulated weekly payments to the ward's daughters. The trustee made the payments from principal rather than income, and such payments came under attack in that case. It was held that such payments could not be justified because it was clear that they had been authorized from income. The then Vice Chancellor went on to say:

> "The intervenor contends that the payments to the daughters were allowable expenditures and cites various authorities. However, no cases have been found which hold that a trustee for an insane person may, in the absence of an enabling statute, properly pay continuing support allowances out of principal to adult children who, as in this case, are not incapacitated to provide for themselves. Such payments would be inconsistent with the performance of that fundamental duty of a trustee to preserve the property of the trust."

The apparently unopposed order authorizing the payments recited, *inter alia,* that it appeared that the ward "would make similar provision for the support and maintenance of said daughters were she not of unsound mind". It therefore appears that there was no evidence and therefore no finding in the case that the ward, if sane, would have made such payments from the principal of her estate. Thus the court was not called upon to consider the principle of substitution of judgment. If the quoted language was intended to suggest that the principle of substitution of judgment, which incidentally was implicitly recognized by the Chancellor who entered the original order, can have no application to a disbursement from principal, it is not an acceptable statement of the Delaware law. I conclude that the substitution of judgment doctrine is not so restricted. Rather, the fact that a disbursement of principal is involved in the request only requires the court to move with greater caution in exercising its discretion.

■ I conclude that under 12 *Del.C.* §§ 3705 and 3914(d) this court is empowered to invoke the so-called substitution of judgment doctrine here.

■ With these considerations in mind I return to the present application. The guardians assert that the distribution sought to be

made here, if carried into effect during the ward's life, will result in a tax saving of at least sixteen million dollars and will ultimately enlarge by that amount the dollar size of the ward's estate passing to the beneficiaries designated in his will. The proposed scheme of distribution in substance duplicates the ward's testamentary plan, the purpose being to follow as nearly as possible what the ward would presumably have done had he been capable of managing his own affairs. The guardians have offered substantial and convincing proof that the ward in fact intended to make such distributions prior to his incompetency. Furthermore, the property remaining in the guardians' hands after the proposed distribution was shown to be more than sufficient to administer the balance of his estate and to maintain him in the manner in which he was accustomed to live.

While I recognize that the court should move with great caution in this area, I am satisfied that the guardians have amply proved that the gifts will carry out a plan which he would himself have instituted had he been capable of doing so. Therefore, in the exercise of my discretion under § 3705 and § 3914(d), I will authorize the guardians to make the proposed distributions in accordance with the terms of the trust instrument incorporated in the petition, subject to the following modifications: (1) a gift over to the State of Delaware will be provided for so that there will be no possibility, for tax purposes, of a reversion to the ward's estate in the event he should die without issue living at his death; (2) the provision authorizing the trustees to apportion trust receipts between principal and income "in such manner as the trustees may deem equitable or proper" will be deleted. Certain modifications suggested by the amicus have been considered. Having in mind the objectives sought to be accomplished, I conclude that such changes should not be adopted.

Present order on notice.