[Civ. No. 23345. · First Dist., Div. One. Feb. 8, 1967.]

Estate of MARGARET CHRISTIANSEN, an Incompetent Person. HARRY CHRISTIANSEN, as Guardian, etc., Petitioner and Respondent, v. HARRY CHRISTIAN-SEN, Individually, Claimant and Appellant.

Lakin, Spears & Gullixson and Conrad F. Gullixson for Claimant and Appellant.

Herrick, Gross & Mansfield and Richard G. Mansfield for Petitioner and Respondent.

SIMS, J.—Harry Christiansen, as a son and one of the prospective heirs of Margaret Christiansen, an incompetent, has appealed personally from an adverse order entered upon a petition for instructions which he filed as guardian of her estate. By the petition he sought authorization, as guardian, to make gifts to the children and grandchildren of the incompetent "to cut down on the burden of excessive taxes against the estate and to permit the enjoyment of property of the incompetent by her family during her lifetime."

*Parties to the Appeal*

Before considering the appeal on the merits, this court raised the question of the propriety of entertaining an appeal in which the appellant and the respondent appeared to be the same party, albeit in different capacities. (See *Byrne* v. *Byrne* (1892) 94 Cal. 576, 579-580 [29 P. 1115, 30 P. 196]; 2 Witkin, California Procedure (1954) Pleading, § 24, p. 1000; *Tate* v. *Tate* (1950) 190 Tenn. 39, 40 and 42-44 [227 S.W.2d 50, 51-52]; Comment (1965) 11 Villanova L.Rev. 150 at pp. 156-157; and Note (1964) 52 Cal.L.Rev. 192 at pp. 195-196.)

There have been filed with the court, and the record is deemed augmented by, copies of a petition and order which reflect that the guardian was authorized to retain independent counsel to represent the guardianship estate on this appeal. This counsel has appeared and filed an informative brief which zealously advocates the propriety of the order of the lower court.

In *Byrne* it was recognized on rehearing that the plaintiff could sue personally on her claims against the estate, even though she was administratrix, if she made all heirs and creditors of the estate parties (94 Cal. at pp. 580-581; and see *Keyes* v. *Hurlbert* (1941) 43 Cal.App.2d 497, 501-503 [111 P.2d 447]).

In *Haberly* v. *Haberly* (1915) 27 Cal.App. 139 [149 P. 53], the same individual represented his incompetent mother as guardian and the estate of his deceased brother as administrator. As guardian he presented his mother's claim against the estate and it was rejected by the judge in the probate proceedings. He then filed suit, and when the residuary legatee of the state successfully demurred to the complaint, a guardian ad litem was appointed for the claimant mother. The legatee asserted that the case was still "one in effect wherein the same person was appearing as both plaintiff and defendant." The court ruled: "It is the rule ordinarily, and for reasons that are obvious, that courts will not entertain jurisdiction of an action where the plaintiff and defendant are in fact one and the same person; but the rule has no application to the facts of the present case. The claim of the plaintiff against the estate of . . . deceased, having been rejected by the court in which the estate was pending, relegated her to an action upon the claim; and she could not be deprived of that remedy merely because the guardian of her person and estate happened to be at the same time the administrator of the estate of the deceased. The suggestion that a guardian *ad litem* be appointed for the purpose of bringing suit was apparently made in good faith, and it does not appear here that the action was instituted for the purpose of procuring a collusive judgment. That the action was defended in good faith is evidenced by the vigorous defense interposed by the counsel who, nominally representing [the administrator], in fact appeared in and defended the action as the attorney for the residuary legatee under the will of the deceased, who was the one person most interested in the defense of the action." (27 Cal.App. at p. 141.)

The order of the trial court in response to a petition for instructions (Prob. Code, § 1516) is an appealable order. (Prob. Code, § 1630; and see *Stratton* v. *Superior Court* (1948) 87 Cal.App.2d 809, 812 [197 P.2d 821]; and cf. *Estate of Charters* (1956) 46 Cal.2d 227, 234 [293 P.2d 778] and *Estate of Ferrall* (1948) 33 Cal.2d 202, 204 [200 P.2d 1, 6 A.L.R.2d 142], construing Prob. Code, §§ 1120 and 1240 in regard to appeal from an order instructing a trustee; and *Estate of Putnam* (1959) 175 Cal.App.2d 781, 783-784 [346 P.2d 841], construing §§ 1120 and 588 in regard to appeal from an order instructing an executor or administrator.)

The foregoing authorities make it clear that the representative—the guardian in this case—may institute an

appeal from the failure to grant the relief where it appears that the estate will be adversely affected by the ruling of the trial court. In such event, it is conceivable that there could be no representation of any possible alternative interest of the estate. Here the appeal is by an individual who is allegedly aggrieved by the failure to grant the authorization which the guardian requested. The doctrine which is recognized in *Byrne* precludes that same individual from acting as the representative of the estate of the incompetent, where, according to the decision of the lower court, the estate has an interest adverse to that asserted by him on the appeal.

The record now reflects that this objection has been recognized and met. There has been no substitution of representatives, as suggested in *Byrne* prior to rehearing (94 Cal. at p. 580), nor has a guardian ad litem been appointed to represent the incompetent in this matter, as was done in *Haberly* (27 Cal.App. at p. 141). Nevertheless the appointment of independent counsel would appear to permit the nominal continuance of the litigation in the name of the ward's estate, with the son, as guardian, as the respondent. The litigation was so continued in *Haberly*. There the attorney for the residuary legatee represented the interest of the estate, and the court noted that the litigation was then only nominally in the name of the individual who had a possible adverse interest.

The real party in interest is the incompetent, and the general guardian, or, if appointed, a guardian ad litem merely appears for him. (See Code Civ. Proc., § 372; Prob. Code, § 1501; *Fox* v. *Minor* (1897) 32 Cal. 111, 116-119 [91 Am.Dec. 566]; *Siegal* v. *Superior Court* (1962) 203 Cal.App.2d 22, 24-25 [21 Cal.Rptr. 348]; and 2 Witkin, *op. cit.*, Pleading, § 26, p. 1003.) In *Fox* v. *Minor*, the court noted: "executors and administrators are strictly and technically representatives of the deceased, while guardians are not technically representatives of anybody. They simply stand in the position of protectors. The guardian is the counsel assigned by operation of law to conduct the suit." (32 Cal. at p. 117; and see *O'Shea* v. *Wilkinson* (1892) 95 Cal. 454, 456 [30 P. 588].)

Prudence might have dictated the appointment of a guardian ad litem to represent the interests of the incompetent in resisting the appeal, taken in his individual capacity, by the same person who was her general guardian. Nevertheless, since the aims of such appointment—to procure proper representation of the interests of the ward and to prevent a

collusive judgment — have been attained, the procedure followed is approved, and the appeal will be entertained.

### Statement of Facts

On July 10, 1943, Margaret Christiansen was admitted to Agnews State Hospital and five days later she was adjudged insane and ordered committed. On March 13, 1952, after proceedings regularly taken to that end, appellant was appointed the guardian of her estate.

In August 1954 her husband, the father of appellant died. A thorough search was made for any will he might have left, and it was determined that, although he had gone through the paperwork of preparing a will, he had never executed it. According to the inventory and appraisement filed in the guardianship proceedings, the incompetent, after her husband's death, had an estate consisting of real property, stocks and bonds, cash, and personal property appraised at $166,420.19 as of November 3, 1955.

The incompetent was released from the hospital on an indefinite leave of absence December 11, 1963, and was placed in the home of her son Robert in Palo Alto.

On July 8, 1965, appellant, as guardian, filed his petition for authorization to make gifts from the guardianship estate of $3,000 per year, over a period of three years, to each of three children and seven grandchildren of the incompetent. This petition was accompanied by documents entitled ''Assent to Lifetime Gift Program'' executed by the incompetent's daughter and other son, individually and for their respective minor children, and by her three adult grandchildren. In open court the petition was amended to limit the application to a one-year program.

At the hearing on the petition October 6, 1965, evidence was produced which established, in addition to the facts set forth above, the following:

The incompetent attained 73 years on September 2, 1965. A medical examination later that month reflected that her health was very good for her age, that she had slight high blood pressure, but nothing that was unusual. She ate well, was happy, had no problems, and appeared in excellent health.

A psychiatrist testified that he had reviewed the records at the state hospital and had examined the incompetent on September 20, 1965. He diagnosed her condition as a severe and chronic schizophrenic reaction of the paranoid type. He found she was delusional and hallucinating and that her

insight and her judgment with regard to her own life and person was virtually nil. There was no indication in the hospital records that she was ever free from obvious gross psychiatric manifestations throughout a period of over twenty years. In his opinion her recovery was highly unlikely. He stated that the recovery rate of people who have been ill as long as she had, particularly in her age group, is fractional and so small that it is hard to document any cases where it has occurred.

During the 10 years since the inventory was filed her estate had increased to a value of $298,784.87, as of April 30, 1965. The net income in 1964 after taxes was slightly over $9,000. The overall annual expense of her support and maintenance was less than $5,000, and consisted principally of $300 per month paid to her son Robert for her food, lodging, and minor purchases. It was acknowledged that this son's health was poor,[1] that there was a possibility that the mother would not be able to continue in his home, and that she would have to be placed in a rest home, or nursing home or hospital, at a cost of from $400 to $550 per month. In the petition it was alleged that the total amount necessary for her care, comfort and maintenance probably would not exceed $8,000 per year, even if the medical expenses increased.

In the search for the father's will the children looked in all the private papers in the home and at his office. They communicated with his attorneys as well as banks and other organizations with which he did business or had social connections. Although apprised at the time of the importance of a will of the mother, no such instrument has ever been found.

In the event of her death intestate, those entitled to her estate would be determined by the provisions of section 222 of the Probate Code.[2] The record reflects that the incompetent's children consisted of a son who died as an infant without issue, the petitioner, aged 51 at the time of the hearing, a son Robert,[3] and daughter Anna Marion Heryford aged 42 who had emigrated to Australia. The grandchildren consisted of the adult son and daughter of petitioner, an adult son, and a

---

[1]According to the uncontradicted statement of appellant, this son died December 17, 1965.

[2]Probate Code section 222 provides: "If the decedent leaves no surviving spouse, but leaves issue, the whole estate goes to such issue; and if all of the descendants are in the same degree of kindred to the decedent they share equally, otherwise they take by right of representation."

[3]See footnote 1.

minor son and daughter of Robert, and two minor daughters of M^rs. Heryford.

It is not asserted that any payments are necessary for the comfortable and suitable support, maintenance and education of any of the proposed distributees as members of the family of the ward. (Cf. Prob. Code, § 1502; *Guardianship of Talbot* (1958) 156 Cal.App.2d 816, 820-821 [320 P.2d 20]; and *Gaskins* v. *Security-First Nat. Bank* (1939) 30 Cal.App.2d 409, 415 [86 P.2d 681].)

The evidence does reflect that, prior to the mother's incompetency, the family had a close and affectionate domestic life. Following her incompetency, she was brought home for holiday visits and manifested that she liked to be with the family. She was supplied with funds by her husband, and later by the guardian, and would shop with her daughters-in-law for Christmas and birthday presents for members of the family.

The guardian testified that the estate and inheritance taxes on the value of the estate would approximate $78,000, or $80,000; and that if $30,000 were given away, as proposed, and the incompetent survived a period of three years, there would be a tax saving of approximately $10,000 or $11,000.

### Ruling of the Trial Court

After receiving this evidence the court entered an order instructing the guardian not to make gifts from the principal of the incompetent's estate. It did, however, by separate order, authorize the payment of $1,250 to each of the adult children of the incompetent, or a total of $3,750, from the surplus income of the estate. No appeal has been taken from this second order, which was apparently predicated upon the provisions of section 1558 of the Probate Code.[4]

---

[4]Probate Code section 1558 provides in part: "On the application of the guardian or next of kin of an insane or incompetent person, the court may direct the guardian to pay and distribute surplus income, not used for the support and maintenance of the ward, or any part of such surplus income, to the next of kin whom the ward would, in the judgment of the court, have aided, if said ward had been of sound mind. The granting of such allowance and the amounts and proportions thereof shall be discretionary with the court, but the court shall give consideration to the amount of surplus income available after due provision has been made for the proper support and maintenance of the ward, to the circumstances and condition of life to which the ward and said next of kin have been accustomed and to the amount which the ward would, in the judgment of the court, have allowed said next of kin, had said ward been of sound mind."

In the order denying the authority to make gifts from the principal of the estate the court found: ''that the Court does not have power and authority under California law to authorize gifts from the principal of the guardianship estate for the purposes as set forth in the petition.''

In rendering his oral decision, the judge not only alluded to lack of power and authority, but also pointed out that there was a possibility that the incompetent might recover, that she might have left a will, that there was nothing to show that, if competent, she would have made a gift to anyone in contradistinction to entertaining a desire to retain possession and control of her property despite the tax consequences, that a severe economic depression might render the remaining estate inadequate for her support, and that the court was charged with the duty of conserving the incompetent's estate for her benefit, and was under no obligation to concern itself with the tax consequences to the beneficiaries in the event of her death.

### Questions Presented

■ The remarks of the trial judge lend themselves to the interpretation that if the trial court did have the power and authority to authorize gifts from the principal of the incompetent's estate, it would have exercised its discretion on the facts to deny the authorization. However, no findings on the factual issues were incorporated into the order from which this appeal has been taken. It will be assumed, therefore, that the court determined as a matter of law that it had no discretion to exercise. (Cf. *Guardianship of Cookingham* (1955) 45 Cal.2d 367, 375-376 [289 P.2d 16]; and see as to effect of the judge's opinings *Union Sugar Co.* v. *Hollister Estate Co.* (1935) 3 Cal.2d 740, 749-751 [47 P.2d 273]; and *Bailey* v. *Fosca Oil Co.* (1960) 180 Cal.App.2d 289, 293-295 [4 Cal. Rptr. 474].) Furthermore, the criteria for the exercise of such authority, if it does in fact exist, are interrelated with the questions which are posed in resolving the question of the existence of such power. Therefore, any discussion of the proper exercise of discretion cannot be disassociated from an examination of the principles upon which the right to make gifts or advancements has been authorized.

■ The questions presented therefore may be summarized as follows: Do California courts have power and authority to authorize gifts from the principal of an incompetent's estate, and if so, what factors determine whether such authority should be granted?

An examination of existing precedents leads to the conclusion that the power and authority exist under the general equitable powers of the court sitting in the exercise of its jurisdiction over the estates of incompetents; and that the criteria necessary for the proper exercise of the discretion of the trial court should first be applied by that court.

### The Power to Authorize Gifts From the Principal of an Incompetent's Estate

It is generally stated: "Neither a general guardian nor a court has the power to dispose of a ward's property by way of gift." (39 C.J.S., Guardian and Ward, § 79, p. 123; and see 44 *id.*, Insane Persons, § 81, p. 191; 25 Am.Jur., Guardian and Ward, § 79, p. 52; *Harris* v. *Harris*, (1962) 57 Cal.2d 367, 370 [19 Cal.Rptr. 793, 369 P.2d 481]; and *Guardianship of Hall* (1947) 31 Cal.2d 157, 168 [187 P.2d 396].)

If there is any warrant for so disposing of the ward's property, it must be found in the application of what is sometimes referred to as the doctrine of substituted judgment. The existence and source of the doctrine have been recognized in this state as follows: "Brief reference to the historic development of this branch of the law reveals that the authority of the courts to make allowances from an incompetent's estate is the logical outgrowth of their wide powers in the disposition and management of such person's property. The doctrine is well established in England, since the decision of Lord Eldon in *Ex parte Whitbread, in the Matter of Hinde*, 2 Merivale 99 [35 Eng. Reprint 878], decided in 1816, that the chancellor may, under proper circumstances, grant to needy relatives part of the surplus income of an incompetent. In approving such payments, the court will act with reference to the incompetent and for his benefit as it is probable that he would have acted for himself, if he were of sound mind." (*Guardianship of Hudelson* (1941) 18 Cal.2d 401, 403-404 [115 P.2d 805].)[5]

---

[5]The application of this doctrine has been a persistent source of comment. The interested reader is referred to the following: Thompson & Hale, *The Surplus Income of a Lunatic* (1895) 8 Harv.L.Rev. 472; Carrington, *The Application of Lunatics' Estates for the Benefit of Dependent Relatives* (1914) 2 Va.L.Rev. 204; Note (1928) 14 Cornell L.Q. 89; Note (1928) 41 Harv.L.Rev. 402; Note (1929) 13 Minn.L.Rev. 152; Note (1928) 77 Pa.L.Rev. 136; Note (1928) 37 Yale L.J. 525; Comment (1929) 17 Cal.L.Rev. 181; Note (1940) 54 Harv.L.Rev. 143; Note (1942) 15 So.Cal.L.Rev. 265; Comment (1943) 28 Iowa L.Rev. 703; 25 Am.Jur., Guardian and Ward, § 79, p. 52; Annotations (1896) 34 A.L.R. 297, 298-301; (1929) 59 A.L.R. 653, 653 and 659-664; (1946) 160 A.L.R. 1435, 1436-1438 and 1442-1445; (1965) 99 A.L.R.2d 946, 946-948; and see Notes 10 and 11, *infra.*

It is asserted, on behalf of the ward's estate, that the general equitable doctrine has no place in the jurisprudence of this state because the provisions of section 1558 of the Probate Code (fn. 4, *supra*) expressly authorize and delimit the exercise of the power to utilize the income or principal of the estate of an insane or incompetent person for payments other than for the support and maintenance of the ward and his family as provided in sections 1502[6] and 1530[7] of that code. (See Note (1964) 24 Md.L.Rev. 332, 338.)

Some jurisdictions have held or suggested that the statutory provisions governing the administration of an incompetent's estate are controlling, and in such proceedings preclude the exercise of general equitable jurisdiction, as was the practice of the chancery court under the common law. (*In re Guardianship of Estate of Neal* (1966, Tex.Civ.App.) 406 S.W.2d 496, 501-503; *Kelly* v. *Scott* (1958) 215 Md. 530 [137 A.2d 704]; *Bullock Estate* (1957) 10 Pa.D.&.C.2d 682, 684-685 [44 Del.Co.Rep. 171, 173] [but cf. *Hambleton's Appeal* (1883) 102 Pa.St. 50]; *Binney* v. *Rhode Island Hospital Trust Co.* (1920) 43 R.I. 222, 239-242 [210 A. 615, 622-623]; *Lewis* v. *Moody* (1924) 149 Tenn. 687 [261 S.W. 673] [cf. *Monds* v. *Dugger* (1940) 176 Tenn. 550 [144 S.W.2d 761] construing subsequently adopted statute].)

In this state it has been said: "Guardianship matters are special proceedings, and the validity of orders must be determined from a consideration of the governing statutes. [Citations.]" (*Guardianship of Kentera* (1953) 41 Cal.2d 639, 642 [262 P.2d 317].) General equitable considerations will not override the statutory directions which cover the matter of the

---

[6]Probate Code, section 1502, provides, in relevant part, as follows: "Every guardian of an estate must manage it frugally and without waste, and apply the income, as far as may be necessary, to the comfortable and suitable support, maintenance and education of the ward and his family, if any; and if the income is insufficient for that purpose, he may sell or mortgage or give a deed of trust upon any of the property, as hereinafter provided."

[7]Probate Code, section 1530, provides: "If the income of an estate under guardianship is insufficient for the support, maintenance and education of the ward or of such members of his family as he is legally obligated to support and maintain, including his care, treatment and support, if confined in a State hospital for the insane, or if the personal estate and the income from the real estate is insufficient to pay his debts, or if it is for the advantage, benefit, and best interests of the estate or ward or of such members of his family as he is legally bound to support and maintain, his guardian may sell any of his real or personal property, or mortgage or give a deed of trust upon any of his real property for any of such purposes, subject to authorization, confirmation or direction by the court as hereinafter provided."

appointment of a guardian. (*Guardianship of Salter* (1904) 142 Cal. 412, 413 [76 P. 51].) Guardianship proceedings, which historically were within the equitable jurisdiction of the chancellor, are, in this state "in *probate.*" (*Sullivan* v. *Dunne* (1926) 198 Cal. 183, 189 [244 P. 343].) "It is settled law in this state that probate proceedings are special in their nature and purely statutory in their origin. [Citations.]" (*In re Bundy* (1919) 44 Cal.App. 466, 468 [186 P. 811].)

Nevertheless, the foregoing cases recognize an analogy between the statutory scheme and the discretion vested in the chancellor (*Sullivan*, 198 Cal. at p. 189; and see *Guardianship of Reynolds* (1943) 60 Cal.App.2d 669, 673-675 [141 P.2d 498]). For example, since a jury trial was not a matter of right in such matters at common law, it can only be had where expressly authorized by the Probate Code. (*Bundy*, 44 Cal. App. at pp. 470-471.)

In *Guardianship of Hudelson, supra,* 18 Cal.2d 401, it was contended that the provisions of section 1558 precluded the court from conditioning an allowance made thereunder by a provision that the amounts paid to the petitioning adult daughter should constitute an advance on any inheritance she might receive upon the death of her father, the incompetent ward. In the course of upholding the condition, the court reviewed the English and American precedents and concluded, "that the courts, in the course of their administration of the estates of incompetents and independent of any statutory authority, have exercised jurisdiction to grant allowances with or without conditions, as the facts warranted." (18 Cal.2d at p. 406.)

The court then turned to the contention made by petitioners and stated: "this rigid interpretation of the scope of the statute is not reasonable in view of the broad terms in which this section is couched, demonstrating that the purpose of this enactment was to supplement and confirm the inherent jurisdiction of the court, acting in equity, to exercise full control over incompetents and their property. In addition, the statute set up a standard for the guidance of the court in its ruling upon an application for aid to next of kin of the ward: To pay and distribute any part of the 'surplus income' of the incompetent not needed for his support and maintenance, to the next of kin whom the ward would, 'in the judgment of the court,' have aided, if said ward had been of sound mind. In so doing the court acts for the incompetent in reference to his estate as it supposes the incompetent would have acted if he

had been of sound mind, which principle coincides with the doctrine of both the English and American authorities, as reference to the above discussed cases will indicate. It reasonably follows that the court in making allowances may attach conditions if it finds that the ward, had he the capacity to act, would have imposed them. If this were not possible, the court in many instances would be constrained to refuse the application for payments rather than grant it without terms. The statute's endorsement of a policy of flexible procedure, resting in the sound discretion of the court, permits recourse to principles of equity responsive to the interests of both the ward and next of kin.'' (*Id.*, pp. 406-407.)

The foregoing specifically recognizes that the statutory scheme should be interpreted ''to supplement and confirm the inherent jurisdiction of the court, acting in equity, to exercise full control over incompetents and their property.'' (*Id.*, p. 406; see Note (1942) 15 So.Cal.L.Rev. 265, 266.) It does not, however, directly answer the question of whether the statute precludes the exercise of any inherent jurisdiction to authorize payments or distributions, which, in the judgment of the court, the ward would have himself made had he been of sound mind, if such payment or distribution is to be made from other than ''surplus income'' or to other than one falling in the category of ''next of kin.''

That such general jurisdiction exists is suggested by two subsequent opinions of the Supreme Court In *Guardianship of Hall, supra,* 31 Cal.2d 157, an appeal from an order overruling objections to a guardian's account, the following appears: ''Appellants specify as their third point on appeal their objection to allowances made in the account for 'gifts,' in the amount of several hundred dollars from the estate's funds, to individuals, to charities and to a political organization. While appellants argue that 'neither the general guardian nor a court has the power to dispose of the ward's property by way of a gift' (39 C.J.S. 123, § 79), such rigid principle has its exception where allowances from the surplus income of the estate are sought as 'donations for charitable and religious purposes' and with the object of 'carrying out the presumed wishes of' the incompetent person (25 Am.Jur. 52, § 79; *In re Brice's Guardianship,* 233 Iowa 183 [8 N.W.2d 576, 579]). However, such exception does not aid respondent where it not only appears that no previous court authorization for the 'gifts' was obtained, but, in addition, none would seem proper in view of her failure to offer sufficient support-

ing evidence therefor in the light of the noted limitations governing the propriety of such allowances. So to this extent also the account requires further examination.'' (31 Cal.2d at pp. 167-168.) The fact that the court sent the matter back for further examination suggests that if evidence were introduced to show the presumed wishes of the ward, the guardian would be allowed gifts made for carrying out that object.

The same principle has been more recently recognized in *Harris* v. *Harris, supra*, 57 Cal.2d 367, 370. The majority of the court found that gifts by the guardian, apparently of principal, could not be confirmed because there was no court permission before or after making the contested gifts, and because there was no evidence to show that the ward would have approved the gifts, had she been competent. (57 Cal.2d at p. 371.)

From the foregoing it is concluded that the provisions of section 1558 do not preclude the courts of this state from exercising the substituted judgment doctrine in situations not covered by that section.

It is also contended that the statutory scheme embodied in sections 1502 and 1530 of the code (see fns. 6 and 7, *supra*) prevents any disposition of the income or principal of the ward's estate other than as expressly (§ 1558) provided to the contrary. These sections set forth the state's solicitude for needs of the ward and his family which, in any event, must be satisfied before the doctrine of substituted judgment can be applied. They do not purport to define what should be done with excess income, or principal in excess of that necessary to produce the income necessary for these basic needs. In fact, similar provisions, formerly embodied in the Code of Civil Procedure (§§ 1770 and 1777) did not preclude an allowance to an adult child. (*Estate of Lynch* (1894) 5 Cof.Prob. 279, 281.) As hereinafter discussed, there may be occasions when the mandate to manage the estate ''frugally and without waste'' dictates that resort should be had to the doctrine.

Section 1516 of the Probate Code, under which these proceedings are being prosecuted, provides in part: ''*In all cases where no other or no different procedure is provided by statute*, the court on petition of the guardian, . . . may from time to time instruct the guardian as to the administration of the ward's estate and the *disposition,* management, care, protection or preservation of the estate or any property thereof.'' (Italics added.) This language appears to contem-

plate that there are situations for which no provision is made in the statutory scheme, and that such situations may include those involving a disposition of the ward's property. (Cf. the provisions of Prob. Code, §§ 588, 1120 and 1860.)[8] In *Estate of Traung* (1962) 207 Cal.App.2d 818 [24 Cal.Rptr. 872], this court held that the broad jurisdiction conferred by section 1120 gave the probate court the same power to authorize or direct a deviation from the terms of a trust as a court exercising general equitable jurisdiction would have. (207 Cal.App. 2d at pp. 827-829.) Similarly section 1559 gives the probate court the power to consider matters affecting the estate of the incompetent which are not expressly covered by the statutory scheme.

This conclusion is further indicated by the nature of the cases to which the court referred, apparently with approval, in the *Hall* and *Harris* decisions. In *re Guardianship of Brice* (1943) 233 Iowa 183 [8 N.W.2d 576] stands for the proposition that general powers of management conferred by statute embrace the question of whether payments should be made to a needy relative of the incompetent who was not legally entitled to support. (233 Iowa at pp. 186-188, 8 N.W.2d at pp. 578, 579.)

The factors to be considered were set forth as follows: "In determining whether the incompetent, if sane, would contribute to the support of a relative to whom he owes no duty of support, the court will consider the needs of the relative, the relationship and intimacy which he bore to the incompetent prior to the adjudication of incapacity, the present and probable future requirements of the incompetent himself, whether others are dependent upon him for support and the extent of such dependency, the size and condition of the estate —giving to these and any other pertinent matters such weight as the incompetent, if sane, probably would have given. In *re Fleming's Estate,* 173 Misc. 851 [19 N.Y.S.2d 234, 236], and cases cited." (233 Iowa at p. 187, 8 N.W.2d at p. 579.)

The opinion acknowledged: "It is true the evidence does not disclose the exact amount contributed by [the ward] while sane for the support of the applicant and his family. And there is no way of knowing just how much the ward would

---

[8]It is unnecessary to determine herein whether similar considerations would apply to a conservatorship under division 5 (§§ 1701-2207) of the Probate Code. "The mere fact that a conservator is appointed is not a determination that the conservatee is in any wise 'insane or incompetent.' (Cf. Prob. Code, § 1751; L.A. Bar Bulletin, Vol. 33, No. 1, p. 15.)" (*Schuck* v. *Myers* (1965) 233 Cal.App.2d 151, 154 [43 Cal.Rptr. 215].)

now contribute if insanity had not overtaken him"; and concluded: "However, if the probate court had authority to act in the matter, it had at least some discretion in determining the amount to be paid." (233 Iowa at p. 189, 8 N.W.2d at p. 579.)

In response to the contention that the payment of the allowance might involve an invasion of the principal of the ward's estate, the Iowa decision indicated that, on the facts, it was probable that the payments could be made out of surplus income without resort to principal, and also stated: "In most of the cases where allowances from guardianship funds have been authorized for the support of one whom there is no legal duty to support it is probably true that the payments could be made from surplus income. The more recent authorities, however, apparently do not limit the payments which may be authorized to those that can be made out of surplus income. The controlling principle is that the court will act with reference to the incompetent and for his benefit as he would probably have acted if sane. *In re Fleming's Estate,* 173 Misc. 851 [19 N.Y.S.2d 234], holds that such payments may be made even though resort to the principal is necessary. However, payments to one holding no legal obligation against the incompetent should not be authorized unless adequate provision has first been made for the ward." (233 Iowa at p. 189, 8 N.W.2d at p. 580.)

In *Matter of Flagler* (1928) 248 N.Y. 415 [162 N.E. 471, 59 A.L.R. 649] (and see Notes & Comment (1928) 14 Cornell L.Q. 89; Note (1928) 41 Harv.L.Rev. 402; and Note (1929) 17 Cal.L.Rev. 175), the court overruled the decision of the Appellate Division ((1928) 223 App.Div. 1 [227 N.Y.Supp. 318]), which had set aside an allowance granted by the trial court ((1927) 130 Misc. 375 [224 N.Y.Supp. 30]), on the grounds that convincing proof had not been given to show that the incompetent person, if sane, would have made the allowance requested. The Court of Appeals modified the findings of the Appellate Division to provide for an allowance in an amount which the highest court thought proper.

The Court of Appeals acknowledged the propriety of the rule of law relied upon by the intermediate court, and stated: "If [the ward] to-day could decide upon the disposition of the income of her great estate, moral or charitable considerations would dictate her decision only to the extent that she felt their force. Her great affluence might impel her to relieve the distress of her cousin; the law would not compel her to do

so if she decided otherwise. The power of the court to dispose of her income is not plenary. The court may not be moved by its own generous impulses in the disposition of the income of the incompetent. In reaching decision it may give to moral or charitable considerations only such weight as it finds that the incompetent herself would have given to them. Allowances for the support of collateral relatives of the incompetent have been made 'upon the theory that the lunatic would, in all probability, have made such payments if he had been of sound mind.' (*Matter of Lord*, 227 N.Y. 145 [124 N.E. 727].)" (248 N.Y. at pp. 418-419, 162 N.E. at pp. 471-472, 59 A.L.R. at p. 651.)

In ruling on the sufficiency of the evidence, however, the court did not depend upon a subjective intent of the incompetent as manifested by her actions while sane, but acknowledged: "Conflicting inferences might be drawn from the evidence as to [the ward's] spirit of charity and generosity." After reviewing the situation it concluded: "Few would so act ["refuse all help"] under the circumstances here disclosed; the evidence does not justify a finding that [the ward], if sane, might have been among the few." (248 N.Y. at p. 419, 162 N.E. at p. 472, 59 A.L.R. at pp. 651-652.) In short, although the court cannot substitute its own generous impulses, it may free the ward from any disapprobation for abnormal selfishness unless such trait is established.

In *In re Johnson* (1932) 111 N.J.Eq. 268 [162 A. 96], the court recognized the doctrine of substituted judgment and found it applicable in New Jersey. (111 N.J.Eq. at p. 270, 162 A. at p. 96.) It then reviewed the English and American cases. The decision relied principally on the analysis in *Binney* v. *Rhode Island Hospital Trust Co., supra,* 43 R.I. 222, 231-238 [110 A. 615, 619-622], where, as an alternative ground of decision, the Rhode Island court had found the evidence insufficient to support an allowance under the doctrine, and came to the same conclusion on the case before it. (111 N.J.Eq. at p. 276, 162 A. at p. 99; but cf. *Potter* v. *Berry* (1895) 53 N.J.Eq. 151 [32 A. 259].)[9]

*In re Fleming's Estate* (1940) 173 Misc. 851 [19 N.Y.S.2d 234], which, as noted above, was extensively relied upon by

[9]Recognition of the doctrine of substituted judgment in other jurisdictions is evidenced by the following cases: *In re Buckley's Estate* (1951) 330 Mich. 102, 105-109 [47 N.W.2d 33, 35-37]; *Sheneman* v. *Manring* (1940) 152 Kan. 780 [107 P.2d 741, 743-744]; *In re De Nisson's Guardianship* (1938) 197 Wash. 265, 275 [84 P.2d 1024, 1028]; *State* ex rel. *Kemp* v. *Arnold* (1938) 234 Mo.App. 154, 161 [113 S.W.2d 143, 147].

the Iowa court in the *Brice* case, is the principal authority which has come to grips with the question of applying the substituted judgment doctrine to a gift or allowance from the principal of the ward's estate. Its holding that such an allowance may be authorized where the evidence leads to the conclusion that the ward would have so acted if competent, has been criticized (Note (1940) 54 Harv.L.Rev. 143). Nevertheless, it has not only been approved in *Brice, supra,* but has been followed in New York. (*In re Bond* (1950) 198 Misc. 256, 258 [98 N.Y.S.2d 81, 83]), and Delaware (*In re du Pont* (1963) 41 Del.Ch. 300, 312 [194 A.2d 309, 316]; but cf. *In re Schwartz* (1943) 27 Del.Ch. 223, 225-231 [34 A.2d 275, 276-279].)

The effect of the application of the rules, as developed in New York, on the incidence of taxes measured by the value of the property transferred, has been a subject of judicial scrutiny. (*City Bank Farmers Trust Co.* v. *McGowan* (1945) 323 U.S. 594 [89 L.Ed. 483, 65 S.Ct. 496]; same case (2d Cir. 1944) 142 F.2d 599, and (W.D. N.Y. 1942) 43 F.Supp. 790; *City Bank Farmers Trust Co.* v. *Hoey* (2d Cir. 1939) 101 F.2d 9; same case (S.D.N.Y. 1938) 23 F.Supp. 831; and see also *Farwell* v. *Commissioner of Internal Revenue* (2d Cir. 1930) 38 F.2d 791.)

With the development of estate planning, applications similar to that presented here have come to the attention of the courts in other jurisdictions. *Bullock Estate, supra,* 10 Pa. D.&.C.2d 682 [44 Del.Co.Rep. 171], is a case where the court rejected an application by the incompetent's wife, who was also named as the sole beneficiary in his will, for payments to herself and their two daughters for the purpose of reducing the inheritance and estate taxes which would become due on the death of the ward. The court rejected the application, not only for lack of statutory authority, as noted above, but also on the following grounds: "Notwithstanding the unlikelihood of the mental recovery of the incompetent, and notwithstanding the unlikelihood that he will not in the future write a new Will, neither possibility may be entirely excluded. Furthermore, it is within the realm of possibility that one or both of the daughters, as well as the wife, may predecease the incompetent, which event would effect a change in the parties who would inherit the estate of the incompetent upon his death. In any event, incompetence is not the legal equivalent of death, and tax avoidance is not a sufficient legal ground for the intestate distribution of any part of an incompetent's estate

while he is putatively testate and actually alive." (10 Pa. D.&C.2d at p. 685, 44 Del.Co.Rep. at p. 173.)

*In re Carson* (1962) 39 Misc.2d 544 [241 N.Y.S.2d 288], involved a motion by the executors of the deceased incompetent's estate to set aside an order, obtained six days prior to her death, which authorized a gift of a portion of the incompetent's estate to her son and daughter who constituted the next of kin, the only known relatives and the principal legatees under the incompetent's last will and testament. The authorization for the transfer concededly was sought for "advantages to be realized by the estate in the form of savings both as to anticipated taxes and administration expenses in the event that death ensued within a short time." It was further demonstrated that there was ample estate remaining to provide for the ward in the event her death did not follow as quickly as had been predicted by her doctors.

The court set aside the gift to the daughter on the guardian's cross-motion to amend because, under the terms of the will, she was not to receive her share of the incompetent's estate until she attained a certain age. In upholding the gift to the son the court stated: "Such conclusion is fortified not alone by the savings which can be effected but by the further consideration that to do otherwise would result in a loss to the two principal objects of the decedent's bounty and a gain only to the executors in the form of increased commissions and the respective federal and state governments in the form of increased taxes.

"To say this incompetent, if sane, would not have given the same direction this court gave would completely overlook the underlying motive for the very instrument which gave life to these executors.

"To do otherwise wuld lead to a result increasing estate costs to a point hardly consistent with our modern concept of estate planning for tax and other legitimate estate benefits.

"To argue that the executors' motion should be granted because the cases submitted by the committee involved 'gifts' made 'to persons in need and to whom the incompetent, if competent, would have felt a moral or legal obligation to assist in their time of need' overlooks the important fact that even in those cases the court's authority to make the directions given is derived from the general equitable power of this court and its function of guardianship of incompetents.

"It seems irreconcilable that a principle which can sustain a 'gift' to persons to whom the incompetent had only a moral

obligation lacks the vitality necessary to sustain the directions given for the benefit of children of the incompetent and the incompetent's estate.

"To confine the power within the narrow limits suggested would establish a frontier of legal thinking which would stifle and restrict the ingenuity of the bar to expand to new frontiers within the purview of the broad equitable principles involved.

"The fact that the principle is invoked in this and other areas as suggested in the memorandum of law submitted with the original application defeats the argument for its limited application.

"Counsel for the committee, it seems, should be complimented for his ingenuity in utilizing the broad equity powers of this court to blend with current and new situations created by our ever increasing tax structure to the further benefit of the incompetent's estate." (39 Misc.2d pp. 546-547, 241 N.Y.S.2d at pp. 290-291.)

*In re duPont, supra,* 41 Del.Ch. 300 [194 A.2d 309][10] reviews the English and American cases, distinguishes and limits *In re Schwartz, supra,* 27 Del.Ch. 223 [34 A.2d 275], and concludes that the Delaware chancery court "is empowered to invoke the so-called substitution of judgment doctrine" to grant authorization to the guardian to make gifts of the incompetent's assets to his children and grandchildren by way of an *inter vivos* trust. The facts on which the application was granted are summarized by the court as follows: "The guardians assert that the distribution sought to be made here, if carried into effect during the ward's life, will result in a tax saving of at least sixteen million dollars and will ultimately enlarge by that amount the dollar size of the ward's estate passing to the beneficiaries designated in his will. The proposed scheme of distribution in substance duplicates the ward's testamentary plan, the purpose being to follow as nearly as possible what the ward would presumably have done had he been capable of managing his own affairs. The guardians have offered substantial and convincing proof that the ward in fact intended to make such distributions prior to his incompetency. Furthermore, the property remaining in the guardians' hands after the proposed distribution

---

[10]See the following comments: Note (1964) 52 Cal.L.Rev. 192; Note (1964) 24 Md.L.Rev. 332; Note (1964) 62 Mich.L.Rev. 1471; Comment (1964) 112 U. Pa.L.Rev. 1083.

was shown to be more than sufficient to administer the balance of his estate and to maintain him in the manner in which he was accustomed to live." (41 Del.Ch. at p. 315, 194 A.2d at p. 317.)

*In re Trusteeship of Kenan* (1964) 262 N.C. 627 [138 S.E. 2d 547], and same case (1964) 261 N.C. 1 [134 S.E.2d 85, 99 A.L.R.2d 934][11] were cases involving applications, pursuant to North Carolina statutes, for authorization to make charitable gifts (1) from current income, (2) from corpus, and (3) by surrendering the right to revoke an *inter vivos* trust which the incompetent had created, and donating the life estate she had reserved in that trust. In the first appeal, in an opinion in which four of seven justices joined, the court summarized the tax considerations as follows: "The amounts proposed to be given from the current income would largely be offset by a reduction in income taxes. The net cost would still leave Mrs. Kenan with ample income for her own needs. She has no financial (legal) obligation which would be adversely affected. The gift from the principal and the taxes to be paid from the principal for the privilege of surrendering the life income from the trust estate, while large when considered as individual items, are relatively small in relation to the total of Mrs. Kenan's estate. If the gifts are authorized, there will be a substantial saving in estate taxes." (261 N.C. at p. 9, 134 S.E.2d at p. 91.) The court examined the English and American authorities in support of its conclusion: "A court may authorize a fiduciary to make a gift of a part of the estate of an incompetent only on a finding, on a preponderance of the evidence, at a hearing of which interested parties have notice, that the lunatic, if then of sound mind, would make the gift." (261 N.C. at p. 9, 134 S.E.2d at p. 91.) The opinion appears to suggest that, unless this test was satisfied, and presumably the court incorporated it into the interpretation of the statute, there would be an unconstitutional taking of property without due process of law. (261 N.C. at pp. 7-8, 134 S.E.2d at pp. 90-91.) The court concluded that the requirement it established had not been met. The opinion recites: "The language in which the court phrases its findings of facts and its legal conclusions is, we think, significant. They amount only to this: The cost to Mrs. Kenan of making the gifts is, when considered with the size of her income and the

---

[11]See the following comments: Note (1964) 9 Utah L.Rev. 464; Note (1965) 78 Harv.L.Rev. 1483; Note (1965) 43 N.C. L.Rev. 616; Note (1964) 9 Vill. L.Rev. 522; Comment (1965) 11 Vill. L.Rev. 150; and Comment (1965) 67 W.Va. L.Rev. 320.

principal of her estate, insignificant; and the trustee, not Mrs. Kenan or the court, has concluded that it is wise *and consistent with the desires of Sarah Graham Kenan, if she were competent.* The legal conclusion that it is reasonable to assume that Mrs. Kenan, if competent, 'and heeding sound advice,' would make the gifts is not supported by the findings of fact. If it be said that although stated as a conclusion of law this is in reality a finding of fact, we find no evidence to support such a finding.'' (261 N.C. at p. 9, 134 S.E.2d at p. 94.)

On the second appeal, after further hearing on amended petitions as suggested in the first decision, the writer of the original opinion and four associates, including the three who dissented on the original appeal, joined in approving the authorization. The opinion adheres to the rule established on the first appeal, rejects the contention that any attempt to ascertain the intent of the incompetent is by its nature speculative, asserts that lack of benefit to the incompetent herself is no bar so long as there is no prejudice to her, and finds that the evidence on the second hearing was sufficient to sustain findings that she would make the gifts and take the action which had been proposed. From special findings it appears this evidence consisted of a showing that she formerly had been advised while sane, and would have been advised by her advisors and relatives, to follow this program and would have followed that advice.

*In re Guardianship of Estate of Neal, supra* (Tex.Civ. App.) 406 S.W.2d 496, is a case in which the petitioners sought authorization for a transfer to those who were her heirs, in trust, in the same manner as the incompetent had provided in her will for the disposition of the residue of her estate. The trial court found as a fact ''that considering all the facts and circumstances, a prudent man owning and managing the Ward's estate would make the proposed gift,'' but denied the application for lack of express or implied authority ''for a Guardian to make a gift of the Ward's property for the primary purpose of minimizing estate taxes.'' The appellate court rejected the contention that the proposed gift was authorized by a general statute which provided in part: ''It is the duty of the guardian of the estate to take care of and manage such estate as a prudent man would manage his own property.'' It held that other statutory provisions which expressly provided for charitable contributions out of income under certain conditions, and which provided for the support of his family, ''when necessary'' limited the powers of the

court, and precluded application of the doctrine of substitution of judgment as applied in *duPont, Carson* and *Kenan.*

Before evaluating the various arguments for and against authorizing transfers of an incompetent's property for the purpose of tax avoidance, it is important to determine the basis on which the court, in the exercise of its equitable powers, shall determine what the ward would himself have done, if sane. The first *Kenan* case, *supra,* suggests that it would be unconstitutional to apply an objective test, that is, to determine what a reasonably prudent person would do, and then to authorize action accordingly. It required what has been termed a ''subjective standard'' or a determination of what the incompetent would do from evidence of his prior conduct or practice. In the second *Kenan* case the application of this doctrine appears to be strained, in that the desired conclusion was obtained with evidence, not of a pattern of gifts or of methodical estate planning while sane, but in spite of the absence of those factors, on testimony that she had taken and would, if sane, take the advice of the witnesses who would recommend the program. In *duPont* there was clear evidence of the incompetent's prior intent to make *inter vivos* gifts of his property to avoid excessive estate and inheritance taxes.

The continuing pattern theory furnishes a convenient category into which to place the cases where authority has been granted to continue gifts to charities or to individuals to whom the incompetent owed no duty of support. It is generally criticized.[12] It can never be applied in the case of a congenital incompetent. If there is a gradual onset of insanity or senility it is difficult to determine what pattern represented the incompetent's sane intent. In the very nature of things time creates changes in the needs of friends and relatives or in affluence of the incompetent or in other circumstances which could not be foreseen in the sane period of the incompetent's life. No precedent based on the experience of the incompetent may exist, yet common human experience may offer a ready answer to the selection of a course that would be followed by a reasonable man.

In this case, and presumably in many others where there is a long period of incompetency, there is no evidence of any past conduct or practice which throws light one way or an-

---

[12]See Note, *supra,* 11 Vill. L.Rev. 150, 155; Note, *supra,* 78 Harv. L.Rev. 1483, 1485; Note, *supra,* 9 Utah L.Rev. 464, 467-468; Comment, *supra,* 17 Cal.L.Rev. 175, 183; Note, *supra,* 14 Cornell L.Q. 89, 90.

other on what the action of the particular incompetent would be. In the absence of such evidence would it, as suggested in the first *Kenan* case, be unconstitutional to authorize a transfer of the incompetent's property for the purpose of effecting savings in taxes and administrative costs? It is generally concluded that those cases which interpret *Ex parte Whitbread* (1816) 2 Meriv. 99, 35 Eng.Reprint 878, as requiring evidence of past conduct or practice have given the principle enunciated too narrow a construction.[13] Lord Eldon referred to "that which it is probable the lunatic himself would have done" (2 Meriv. at p. 103, 35 Eng.Reprint at p. 879) as noted and relied upon in the first *Kenan* case (261 N.C. at pp. 9-10, 134 S.E.2d at p. 92) and quoted in this state in *Guardianship of Hudelson* (18 Cal.2d at p. 404). He also stated: "The court does nothing wantonly or unnecessarily to alter the Lunatic's property, but on the contrary takes care, for his sake, that, if he recovers, he shall find his estate as nearly as possible in the same condition as he left it, *applying the property in the mean time in such manner as the Court thinks it would have been wise and prudent in the Lunatic himself to apply it*, in case he had been capable." (2 Meriv. at pp. 102-103, 35 Eng.Reprint at p. 879; italics added.)

The gift or transfer of principal is the most obvious example of a transfer of property in derogation of the enjoyment of the property by the ward if he recovers, or, on the ward's death, of the expectancy of an heir, legatee or devisee if he was not the recipient. The same may be said, however, for surplus income which, if not transferred, would otherwise accumulate for benefit of ward, or those who would take on his death. It is perhaps significant that in the numerous cases which have countenanced the latter transfers, there is little or no mention of the constitutional point.[14]

Section 1558 of the Probate Code (fn. 4, *supra*) relies upon "the judgment of the court" to determine "the next of kin

[13]See Notes and Comment, Note 12 and Note, *supra*, 9 Vill. L.Rev. 522, 524-525; In Thompson & Hale, *The Surplus Income of a Lunatic* (1895) 8 Harv.L.Rev. 472 at p. 473, the authors suggest the true rule to be: "Where there is no evidence of any settled intention of the lunatic before his insanity in regard to the matter, or of any intention formed during his rational moments, the court will presume that were the lunatic sane he would act in the matter as any reasonable and ordinarily generous man would act under the same circumstances."

[14]*In re Guardianship of Brice* (1943) 233 Iowa 183 [8 N.W.2d 576], is a case where the constitutional point was raised and denied consideration because it was not presented in the lower court (*id.*, at p. 186, 8 N.W. 2d at p. 578.)

whom the ward would, . . . have aided, if said ward had been of sound mind" and "the amount which the ward would, . . . have allowed said next of kin, had said ward been of sound mind." If the *Kenan* suggestion is correct, this section, contrary to its obvious intent, would have to be narrowly limited to cases where there was proof of prior practice or conduct, or founder on the shoals of unconstitutionality.

Finally, it should be noted that there are other aspects of the administration of the estates of incompetents where following the guide line of an administration which is reasonable and prudent may impinge upon the expectations of the ward, in the event of recovery, or of those who will succeed to his estate on his death. A question may arise as to whether the guardian of the incompetent should intervene to assert the ward's interest against the will of a spouse. (Cf. *In re Brindle's Estate* (1948) 360 Pa. 53 [60 A.2d 1], with *In re Harris* (1945) 351 Pa. 368 [41 A.2d 715] ; and *In re Rieley's Estate* (Prob. Ct. Ohio 1963) 194 N.E.2d 918, with *Ambrose* v. *Rugg* (1931) 123 Ohio St. 433 [175 N.E. 691, 74 A.L.R. 449].) In *Harris* and *Rieley,* where the courts decided against intervention because, in each case, the ward was already provided for adequately, tax burdens were mentioned as a factor. In *Rieley,* the court said: "In the opinion of the Court, what is best for [the ward] is to carry out the plan made by himself and his wife as to the disposition of her property and not make an election for him which would violate what any person of common sense and sound mind and judgment would do under the same circumstances [to avoid "being subjected to double taxation"]." (194 N.E.2d at p. 921.)

Other examples are noted by Fratcher, *Powers and Duties of Guardians of Property* (1960) 45 Iowa L.Rev. 264 at pp. 317-320. If subjective intent were the sole consideration in managing the estate, the ward, who upon recovery could show that his guardian knew of his affinity for speculative investments, would have cause for complaint if circumstances had greatly enhanced the value of such investments held by him at the time of his incompetency, but which had been sold by the guardian for reinvestment of the proceeds in more prudent but less volatile enterprises.

Whether termed a liberal subjective rule or an objective rule tempered and supplemented by evidence of the incompetent's former practices and conduct, the commentators are practically all in agreement that, as suggested 70 years ago (see fn. 13, *supra*), the guardian should be authorized to act

as a reasonable and prudent man would act under the same circumstances, unless there is evidence of any settled intention of the incompetent, formed while sane, to the contrary.[15]

The ghost of constitutional violation is exorcised by established precedents, and by the existence of general equitable powers of the court to do what is best for the ward's interest. The narrow view set forth in *Hilton* v. *Odell-Arney* (1954) 72 Wyo. 389 [265 P.2d 747, 43 A.L.R.2d 1429] is rejected. There the court stated: "In the American Law of Guardianship, by Woerner, at page 454, the author says:

" '. . . Hence, it is held, both in England and America, that the guardian of a person of unsound mind should, in the management of his estate, attend solely and entirely to the interests of the owner, without looking to the interest of those who, upon his death, may have eventual rights of succession . . . .'

"So also is it true that in the management of a ward's estate the comfort or benefit to relatives during the life of the ward should be given no more consideration than is given to their interest in eventual succession to the estate upon the ward's death, unless such comfort or benefit is identified or interwoven with the welfare and interest of the ward." (72 Wyo. 389 at p. 408 [165 P.2d at p. 754, 43 A.L.R.2d at p. 947].

To refuse to permit the management of the incompetent's estate in the manner that a reasonable and prudent man would manage his estate may, in many cases, lead to the improbable conclusion that it was the intent of the incompetent to enrich the taxing authorities rather than the natural or declared objects of his bounty.

The problem is not one of absolutes, but one of weighing many factors, hereinafter pointed out, in order to determine the proper course for the particular incompetent's estate. So long as the action authorized serves the basic aims which can be attributed to the incompetent, neither he nor others should be in a position to subsequently complain.

Over fifty years ago in an article in support of the principle that there was adequate authority to apply lunatics' estates for the benefit of dependent relatives, the commentator said: "It is respectfully suggested that the courts do not need any statutory authority in the administration of lunatics' estates in this respect. Courts of chancery have existed as separate institutions since the reign of Edward III, and their evolution

---

[15]See commentaries fns. 12 and 13, *supra.*

is one of the most interesting features of legal history. They have been the main channels through which advancing ethical conceptions have flowed into our legal system. The body of the law which has been developed through the judicial determination of actual controversies is vastly superior in quality to the body of law made by legislatures, and particularly is this true in regard to matters of equitable jurisdiction. A court of equity has the power, without the aid of statute, to devote itself to the continuous transmutation of the fundamental principles of right, justice and mercy into rules of law whereby the legal system under which we live responds to all the requirements of our complex social organization.'' (Carrington, *The Application of Lunatics' Estates for the Benefit of Dependent Relatives* (1914) 2 Va.L.Rev. 204, 211.) The same thought is echoed more recently, as quoted above from *In re Carson* (39 Misc.2d p. 547, 241 N.Y.S.2d at p. 291) in its application to the problems of estate and inheritance taxes which may be levied upon incompetents' estates in the absence of proper estate planning. (See also, Fratcher, *op. cit.,* 45 Iowa L.Rev. 264 at p. 335, and comments fns. 10 and 11.)

■ It is concluded that the courts of this state, in probate proceedings for the administration of the estates of insane or incompetent persons, have power and authority to determine whether to authorize transfers of the property of the incompetent for the purpose of avoiding unnecessary estate or inheritance taxes or expenses of administration, and to authorize such action where it appears from all the circumstances that the ward, if sane, as a reasonably prudent man, would so plan his estate, there being no substantial evidence of a contrary intent.

### Criteria for Authorization

(a) Permanency of condition: It is generally stated that the proof must show that the insanity is incurable before the court can authorize a gift or transfer. Such was the fact in each of the cases in which the issue of tax avoidance was raised. The evidence appears to establish this factor in the instant case, and it is unnecessary to determine whether it would be an indispensable condition in every case. The question of whether gifts can be made in accord with the natural or intended devolution of the incompetent's property, discussed *infra,* is dependent on the absence of the initiation of a new plan by a recovered incompetent. It may be noted that there is no such requirement for a transfer of surplus income under the provisions of section 1558 of the Probate Code (see

fn. 4). The necessity for permanency of condition may also vary in inverse proportion to the sufficiency of the evidence of the practice or custom of the incompetent, i.e., keeping up an established weekly contribution to a church or a planned series of gifts for tax avoidance. (See Comment, *supra*, 17 Cal.L.Rev. 175 at p. 177, fn. 11.)

(b) Needs of the ward: The payment of the ward's debts and the satisfaction of the obligations for the support of the ward and those who, as members of his family, are entitled to support from his estate, in an amount not disproportionate to the value of his estate and his station in life, are paramount. (See Prob. Code, §§ 1501 and 1502.) No thought can be given to transfers for any purpose until these obligations are met. Where, as was shown in this case, there is surplus income, and principal in excess of that necessary to produce the income required for the ward's maximum forseeable needs, considerations must also be given to a margin of safety for economic fluctuation.

A Texas statute which permits charitable contributions by the guardian requires that the ward have a net income of $25,000 before a gift can be made. (V.A.T.S., Prob. Code, § 398 as referred to in *In re Guardianship of Estate of Neal, supra*, 406 S.W.2d 496, 501.) The North Carolina enabling acts which were considered in *Kenan* (134 S.E.2d at p. 85) require that the income remaining after the proposed gifts be in excess of twice the sum expended for maintenance during the preceding five years. (North Carolina P.L. 1963, chs. 111-113; G.S. §§ 35-2, 35-29.1 to 35-29.16.) The foregoing statutes deal with the power to authorize general charitable gifts, irrespective of the ward's prior practice, and are apparently designed to prevent uneconomic accumulation of income and to promote the disbursement for charity of sums which otherwise would go for taxes.

Section 1558 provides no requirement of accumulating a contingency fund from any of the income remaining after provision for the proper support and maintenance of the ward.

Here again it is difficult to lay down absolute standards. The shorter the life expectancy of the ward, the less need there may be to provide for contingencies. Nevertheless, consideration must be given to the possibility both of increased expense and of reduced earnings on the invested principal.

The evidence here permits findings that there is little margin of safety in the amount by which the income exceeded the

426

possible maximum. Under these circumstances the court's discretion, if exercised, in refusing to disturb the principal, and in limiting any transfers to surplus income, would not be disturbed. On the other hand, the record reflects that the income was 180 percent of the actual expense. Events which have occurred since the hearing (see fn. 1) may enable more definite computation of the former figure.

It is urged that since the precedents presented in favor of authorization of transfers for estate planning involve estates in which not only the principal, but also the income, is measured in millions of dollars, that the showing herein is unworthy of any consideration. This is a demonstrably false approach. If the principal of estate planning for incompetents is proper for the duPonts and the Kenans it is proper for the smallest estate which finds itself in circumstances where it is prudent to do so. In fact, the tax savings by use of the gift tax exclusions alone, may be relatively more important to the donor and to the recipient of the gift than a vastly greater sum to one whose wealth and income exceeds what he can possibly need or spend.

It has been asserted (see Comment, *supra*, 11 Vill. L.Rev. 150 at p. 156) that establishment of this authorization will lead to looting of the estates of incompetents under the guise of tax saving. Such a contention uncharitably and erroneously assumes that the courts will not properly exercise discretion to protect the paramount interest of the ward. There is no more reason to fear the application of this principle than there is to fear that conferring discretion on a trustee to use principal for the life tenant, when needed, will lead to looting of a trust.

■ (c) Devolution of the property: Since on recovery the incompetent would be free to make or change his will, no transfers should be authorized for tax saving purposes alone unless there is no probability of this eventuality.

This case demonstrates that the heirs (or the devisees or legatees who will take if there is a will) cannot be determined until the incompetent's death. The surplus income awarded to son Robert, now deceased, if accumulated and held, would have gone to such of his children as survived the incompetent. If the gifts prayed for had been made, various shares of the incompetent's estate would have gone to the three branches of the family in different proportions than they would take in the event of the incompetent's death intestate.

Where there is a will, the incompetent has furnished evi-

dence of the objects of his bounty, and the manner in which he wishes them to share in his estate. The gift program preempts the natural course of events, but it is sometimes possible to gain the same results by a transfer in trust as in *duPont*. Where the testator's wish demonstrates that a legacy is to be delayed, it may be given effect by denial of the gift, as in the case of that to the daughter in *Carson*.

In the instant case the discrepancies between gift and inheritance need not necessarily be fatal if all other circumstances were present. In the exercise of its discretion the court could accept or reject the proposition that the members of the first generation were not only the natural, but the actual, objects of the incompetent's bounty. If the latter, they should be able to waive their rights to equal shares of any amount properly available for distribution to them, and consent to its distribution to the second generation in any shares they desired. No one of the latter, as the recipient of not only the bounty of his grandmother, but also of the waivers of heirs apparent, could be heard to complain over a discrepancy between what he received as a gift and what he otherwise might have inherited. Furthermore, it is not unreasonable that a grandmother, financially able to do so, would make gifts to her grandchildren as well as her children. On the other hand, in the absence of such consent, or intent, it would appear that the gifts would have to go to the branches of the family in the shares in which they would inherit.

(d) Donative intent: Even in the absence of a showing of former practice or conduct, there must be, as there is evidence of here, some showing of the relationship and intimacy of the prospective donees with the incompetent in order to show that they would be objects of the incompetent's bounty by any objective test. Here again the matter is relative, and dependent on reasonable standards. It is not likely that an incompetent would provide for a divorced daughter-in-law whom he never knew, and the fact that his total net estate on his death would be enhanced by a gift to her is of no consequence. On the other hand, it may be inferred that he would, if sane, have reasonable concern in her son as his grandson. A gift to him would be proper. (See *In re Schley* (1951) 201 Misc. 522 [107 N.Y.S.2d 884], affd. (1952) without opinion 279 App. Div. 1084 [113 N.Y.S.2d 448].)

There was sufficient evidence here to permit exercise of discretion to find that those proposed to be benefited would be objects of the incompetent's bounty if she were sane.

The sum and substance of weighing these factors is to determine whether the incompetent as a reasonably prudent aged lady would make the gifts proposed so as to pass a greater share of her estate to her descendents. There is sufficient evidence to support, without requiring, the exercise of the lower court's discretion to find that the children and grandchildren would be the natural objects of her bounty, that she would deem it to her advantage to make the gifts to effect the proposed tax savings if she could afford to do so without prejudice to her own welfare, and that she would have no hesitancy because there might be some difference between the shares given and the shares that would be received had the same amount of property passed by intestacy.

The evidence that of the $9,000 income, possibly $8,000 might be needed for her support, would indicate that it would be prudent to retain the capital which produces the $9,000 and not impair it. On the other hand, if the income were almost double the foreseeable needs of the incompetent it cannot be said as a matter of law that it would be an abuse of discretion to make any gift from principal, no matter how small.

In view of the nature of the order of the lower court, the absence of findings of fact on the essential issues and the concededly changed condition of the incompetent, the matter should be returned to the trial court, with leave to appellant to file an amended petition if so advised, and for further hearing and decision on the merits.

The order is reversed and the case is remanded, with leave to appellant to file an amended petition, and for further hearing and decision on the merits. Let costs on appeal be taxed to respondent's estate.

Molinari, P. J., concurred.